## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HARRY and JUDITH STRATTON, MATTHEW and JENNIFER COPTHORNE, TRINA LITTLE, MARIA GREGGIO and RAYMOND BARBOSA, on behalf of themselves and all others similarly situated,<br><br>                  Plaintiffs,<br><br>       -v-<br><br>ONEWEST BANK, FSB,<br><br>                Defendant. | **Case No: 1:13-cv-2048**<br><br>**Judge:**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs, by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Class Action Complaint (the "Complaint"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other allegations herein, as follows:

### INTRODUCTION

1.     The Home Affordable Modification Program ("HAMP") was designed by the United States Treasury to allow eligible homeowners, suffering as a result of the national foreclosure crisis, to save their homes by modifying the terms of their mortgage loans. Thus, when OneWest Bank, FSB ("OneWest"), a participating servicer in HAMP, offers customers loan modifications under HAMP and promises to consider permanent modifications, homeowners who live up to their end of the bargain reasonably expect that OneWest will do the same. Instead, however, OneWest consistently mishandles loan modification applications from

eligible homeowners and engages in a systematic effort to avoid granting permanent loan modifications.

2.      OneWest's practices have fallen into an identifiable pattern that is consistent across a wide range of homeowners: OneWest makes a written offer to a pre-qualified homeowner, in which it offers a permanent loan modification if the homeowner makes three monthly trial period payments and complies with OneWest's requests for documentation. Homeowners execute the required documents, submit everything required and make the trial period payments, but OneWest fails to live up to its end of the bargain by failing even to respond to applicants, denying permanent modifications without justification, avoiding permanent modifications by losing paperwork, claiming ignorance of payments made and papers submitted, and engaging in other evasive conduct which makes it extraordinarily difficult, if not completely impossible, for homeowners to obtain loan modifications.

3.      As described herein, OneWest has deliberately implemented a system designed to wrongfully deprive homeowners of the opportunity to modify their mortgages under HAMP. OneWest's intentional and systematic failure to even respond to homeowners who make their monthly trial period payments has caused substantial damages in the form of increased fees, charges, accrued interest, damage to credit, lost opportunities, longer loan payoff times and higher principal balances and other damages. By failing to live up to its obligations, OneWest has left Plaintiffs and other homeowners in a complete state of confusion regarding the status of their modification requests and prevented Plaintiffs and other homeowners from pursuing other avenues of resolution.

4.      Plaintiffs entered into contracts with OneWest and fulfilled their obligations under such contracts, but never received a timely response from OneWest as to whether or not each

was eligible for a permanent HAMP loan modification. Plaintiffs' stories regarding their requests for a loan modification are substantially similar and reflect the experience of thousands of homeowners who have been deceived and harmed by OneWest's deceptive practices.

5.     Plaintiffs seek redress for themselves and all other similarly situated homeowners who have complied with their obligations under agreements with OneWest.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C.§ 1332(d)(2). These claims are brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least two members of the class of plaintiffs is a citizen of a State different from that of Defendant. OneWest is, on information and belief, a citizen of California and plaintiffs Maria Greggio and Raymond Barbosa are citizens of Illinois.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as the unlawful practices are alleged to have been committed in this District, upon information and belief Defendant regularly conducts business in this District, and two of the named Plaintiffs reside in this District.

## THE PARTIES

8.     Plaintiffs Harry and Judith Stratton are husband and wife and currently reside together at 1189 E. Burnett Street, Stayton, Oregon, 97383.

9.     Plaintiffs Matthew and Jennifer Copthorne are husband and wife and currently reside together at 9404 Salt Water Court, Las Vegas, Nevada 89117.

10.     Plaintiff Trina Little currently resides at 152 Varner Drive, Apt C, Winter Haven Florida 33880.

11.     Plaintiff Maria Greggio currently resides at 3030 N. Elbridge Avenue, Chicago, Illinois 60618.

12.     Plaintiff Raymond Barbosa currently resides at 129 Francisco Terrace, Oak Park, Illinois 60302.

13.     Plaintiffs Harry and Judith Stratton, Matthew and Jennifer Copthorne, Trina Little, Maria Greggio and Raymond Barbosa are sometimes referred to herein as the "Plaintiffs."

14.     Defendant OneWest is a Southern California based bank headquartered at 888 East Walnut Street, Pasadena, California 91101. OneWest began operations as a federal savings bank on March 19, 2009 with its acquisition of certain assets and certain limited liabilities of IndyMac Federal Bank, FSB ("IndyMac") from the Federal Deposit Insurance Corporation ("FDIC"). IndyMac was founded as Countrywide Mortgage Investment in 1985 as a means of collateralizing Countrywide Financial loans that were too big to be sold to Freddie Mac and Fannie Mae. In 1997, Countrywide spun off IndyMac as an independent company. At its peak, IndyMac was the largest savings and loan association in the Los Angeles area and the seventh largest mortgage originator in the United States. When home prices declined in the latter half of 2007 and the secondary mortgage market collapsed, IndyMac was forced to hold $10.7 billion of loans it could not sell in the secondary market. Its reduced liquidity was further exacerbated in late June 2008 when account holders withdrew $1.55 billion or approximately 7.5% of IndyMac's deposits. According to SNL Financial, OneWest currently has total assets of $25 billion and $15 billion in deposits. As of August 2012, OneWest was listed as the 44th largest U.S. bank and thrift by SNL Financial.

4

## FACTUAL BACKGROUND

A.    **The National Foreclosure Crisis, IndyMac's Collapse and the Creation of the Home Affordable Modification Program**

15.    Since 2008, the United States has witnessed a foreclosure crisis. A congressional oversight panel noted in 2009 that one in eight mortgages was currently in foreclosure or default.[1] Increased foreclosures have a detrimental effect on borrowers who are at serious risk of losing their homes. Foreclosures also have a negative impact on the surrounding neighborhoods that suffer decreased property values, and on municipalities that lose tax revenue as a result of foreclosures.

16.    In response to the escalating financial and foreclosure crisis, on October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008, subsequently amended by the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 *et. seq.* (2009).   The purpose of the Act was to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C.A. §5201.

17.    The Act granted the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. §5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*   In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. §5213(3).

---

[1]    Congressional    Oversight    Panel,    Oct.    9,    2009    report,    *available*    at    URL http://cop.senate.gov/press/releases/release-100909-foreclosure.cfm (last visited June 28, 2010).

18.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

19.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C.A. §5219. The Act also grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." 12 U.S.C.A. §5129. and imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C.A. §5220.

20.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.  The Making Home Affordable program consists of two subprograms. The first subprogram relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.  The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.

21.     HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.  Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage

obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.

22.     On July 11, 2008, citing liquidity concerns, IndyMac was placed into conservatorship by the FDIC. After operating IndyMac for approximately seven months, in March 2009, the FDIC held an auction for IndyMac's assets, which were sold to IMB HoldCo LLC ("IMB HoldCo"), a thrift holding company controlled by IMB Management Holdings LP, for approximately $13.9 billion.

23.     IMB HoldCo is a limited partnership composed of a group of some of the country's most well-known investors. The investor group was led by OneWest's current Chairman and Chief Executive Officer Steven T. Mnuchin. Prior to starting Dune Capital Management LP (a real estate hedge fund), Mnuchin spent 17 years at Goldman Sachs Group Inc., where he ran its mortgage backed securities business. The IndyMac ownership group also includes no fewer than four billionaires --- Christopher Flowers of J.C. Flowers & Co. (a private equity firm focused on the financial sector), John Paulson of Paulson & Co. (hedge fund), MSD Capital, L.P. (the New York private investment firm for computer mogul Michael Dell and his family), Stone Point Capital (private-equity firm), SSP Offshore LLC (an investment fund managed by George Soros) and SILAR MCF-1 LLC (a New York investment firm specializing in distressed assets).

24.     On March 19, 2009, OneWest issued a press release announcing the completion of the acquisition of the banking operations of IndyMac from the FDIC:

>    OneWest Bank Group LLC, a newly-formed thrift holding company owned by a consortium of private investors, today completed its acquisition of the banking operations of IndyMac Federal Bank, FSB from the Federal Deposit Insurance Corporation (FDIC ). IndyMac's assets and operations were acquired by OneWest Bank, FSB, a newly-formed Pasadena, California-based federal savings bank with total assets of approximately $16.0 billion. With $1.55 billion in common equity

injected by its new owners, OneWest will be well capitalized as measured by its tangible common equity (TCE) ratio.

OneWest will operate as a regional bank, focused on deposits and conforming and jumbo mortgage lending for its retail customers in Southern California. Over time the bank intends to expand its retail branch network, which currently includes 33 branches located primarily in the Los Angeles area. OneWest will operate the national mortgage banking business acquired from IndyMac and continue to modify mortgages in accordance with the program created by the FDIC. OneWest will explore opportunities with other institutions to leverage its experience and expertise with loan modifications. OneWest acquired and will continue to operate Financial Freedom, one of the nation's largest reverse mortgage businesses.

Current IndyMac depositors and customers will be largely unaffected by the transfer of ownership and will be receiving additional information from the FDIC and OneWest in the coming days. OneWest does not plan any branch closures and expects to add more customer-facing employees over time, consistent with its plans to grow OneWest's retail banking presence. Existing IndyMac branches will be transitioned to the OneWest brand over the coming months.

"We appreciate the support of the FDIC and the OTS in completing this transaction, and we are committed to continuing our work with the FDIC and other government agencies to implement programs to help homeowners. We are looking forward to a long and successful relationship with our valued customers, dedicated employees, and the communities we serve," said Steven Mnuchin, Chairman and Chief Executive Officer of OneWest Bank Group, the holding company that now owns the bank. "OneWest will benefit from a strong capital position and support from a committed group of investors."

OneWest Bank's Chief Executive Officer is Terry Laughlin, a veteran banking executive with over 30 years of banking experience who has held senior positions at Merrill Lynch Bank & Trust, FleetBoston and Mellon Bank.

"We are excited to introduce our customers and communities to OneWest Bank over the coming months," said Mr. Laughlin. "We intend to make OneWest synonymous with the kind of personalized, relationship-based banking that customers should expect from a community bank with deep local roots. I am looking forward to working with my fellow OneWest employees to bring a superior level of service, confidence and commitment to our neighbors. We believe there is a gap in the market for the kind of banking services we intend to provide in the years ahead."

B. **Duties of OneWest as a Participating Servicer Under HAMP**

25.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. In servicing loans and taking the actions described herein, IndyMac/OneWest acted in the capacity of an agent for the entities that held the mortgage loans at issue.

26.     Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program, are subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary. Should a servicer elect to participate in HAMP, it executes a Servicer Participation Agreement ("SPA") with the federal government.

27.     As a condition to its purchase of IndyMac in the FDIC auction, OneWest was required to participate in HAMP for the loans on which it functions as a loan "servicer."

28.     On August 18, 2009, Tony Ebers, Executive Vice President and Chief Operating Officer of OneWest executed an SPA, thereby making IndyMac a participating servicer in HAMP. The SPA executed by Mr. Ebers incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA at ¶ 1.A.), and are incorporated by reference herein.

29.     The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." (SPA at ¶¶ 1.A.,

2.A.) The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01"), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview") and Supplemental Documentation – Frequently Asked Questions ("HAMPFAQS") and Supplemental Directive 09-08 ("SD 09-08"). These documents together describe the basic activities required under HAMP.

30.     The Program Documentation requires Participating Servicers to evaluate all loans that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria. (SD 09-01 at 4.) In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower. According to the terms of the offer accepted, a customer's verified income is the determinant of whether a customer is eligible for a permanent modification and the terms of that final modification.

31.     A HAMP modification is processed in two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP") Agreement.[2] The TPP is a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided by the homeowner. Second, if the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three timely monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification if eligible.

---

[2]     The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

32.     IndyMac offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements, so long as the documentation confirms that the homeowner is eligible for a HAMP modification.

**C.     OneWest Routinely Fails to Meet its Responsibilities Under HAMP and Breaches its Agreements with Plaintiffs and Other Homeowners**

33.     By entering into the SPA, OneWest covenanted that all services, including the servicing of former IndyMac mortgages, would be performed in compliance with all applicable federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices. SPA, Ex. A at ¶ 5(b).

34.     Under the SPA, OneWest also covenanted that it would perform the services required under the Program Documentation in accordance with the practices, high professional standards of care, and degree of attention used in a well managed operation, and no less than which OneWest exercises for itself under similar circumstances, and that OneWest would use qualified individuals with suitable training, education, experience and skills to perform the Services. *Id*. at ¶ 5(d).

35.     OneWest has routinely failed to meet its obligations under HAMP and, instead, has consistently strung out, delayed, or otherwise hindered the modification process it promised to support as a condition to its purchase of IndyMac.  During the relevant period, mortgage borrowers who requested to be evaluated for a modification under HAMP routinely faced unexplained delays and were forced to go weeks or months with no communication from OneWest after providing all requested information and otherwise complying with the terms of TPPs. Borrowers who attempted to contact OneWest by telephone were placed on hold for long periods of time and were

transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call. OneWest regularly falsely informed borrowers that it had not received requested information and demanded that documents be resent. These delay and obstruction tactics left Plaintiffs and other homeowners, whether eligible for a HAMP modification or not, worse off that they had been before they sought HAMP modifications.

36. Former OneWest employees have alleged that OneWest has failed to comply with HAMP in a manner that can only be considered deliberate. On January 10, 2011, a group of OneWest employees sent a letter to former FDIC Chairman Sheila Bair, other regulators and government officials, alleging that OneWest executives had instructed employees to reject as many loan modification applications as possible and created an environment that encouraged loan modification staff to misinform borrowers about their eligibility status, routinely shred loan modification applications, and inappropriately deny loan modifications. The letter also stated that the terms of the FDIC's agreement with OneWest created a financial incentive for OneWest to foreclose rather than modify loans.

37. On July 11, 2011, *The New York Times* published an article written by Representative Patrick McHenry, Chairman of the Oversight Subcommittee on TARP, Financial Services and Bailouts of Public and Private Programs. The article entitled "How Homeowners Are Hoodwinked" explained why HAMP has been a complete failure:

> A few months ago, I introduced the HAMP Termination Act, which was passed by the House and now awaits action in the Senate. My reason for introducing this legislation is simple: the Home Affordable Modification Program is an abysmal failure.
>
> It was created by the Obama administration to stave off the foreclosure crisis and aid troubled borrowers. However, here we are two years later, and the number of homeowners kicked out of the program – and arguably left worse off by participating in the program – still exceeds the number actually helped.

The Treasury department's original goal for the program was 3 to 4 million mortgage modifications. According to their latest Program Performance Report through April 2011, fewer than 700,000 loan modifications had been made permanent. Conversely, nearly 800,000 homeowners who started trial modifications have been rejected from the program.

These homeowners have been strung along by a government program that gave them false hope of keeping their homes, only to leave them with depleted savings, tarnished credit and even higher bills to pay. I have heard from constituent after constituent, all telling a similar story.

They're given a reduced monthly trial payment, but when their modification is rejected due to eligibility issues or "lost documentation," they're told that by paying this reduced trial payment they've essentially defaulted on their mortgage and have to pay the accumulated difference, plus late fees, attorney fees, and are facing foreclosure.

***

If we, as the legislative body of our federal government, can't eliminate a blatant failure of a program that is actively harming Americans every day and costing them billions of dollars, then what can we cut?

38. A recent study indicates that the HAMP has largely been a failure. On August 31, 2012, *Bloomberg* published the following article entitled "Putting Numbers to HAMP's Limited Impact":

That President Obama's signature anti-foreclosure measure never reached its full potential is conventional wisdom by now. No one expects the Home Affordable Modification Program (HAMP) to hit its original goal of modifying the loans for 3 million to 4 million struggling homeowners. A new academic paper using data from more than 30 million mortgages now quantifies just how limited the impact will be.

Six economists and researchers used data on individual loans from the Treasury Department covering about 60 percent of all mortgages to look at HAMP. They found the program will increase the number of loan modifications banks make by about 0.7 percent, or 1.2 million mods—about a third of the original goal. That in turn could reduce the annual foreclosure rate by a maximum of 0.48 percent, which over the life of the program totals about 800,000 fewer foreclosures. The program also had no effect on consumer spending—no extra bump in auto loans, home prices, lower credit-card delinquencies, or other ancillary benefits.

"The program in some sense failed," says Tomasz Piskorski, a professor at Columbia Business School who worked on the paper. When looking for reasons why the program didn't take off as much as the White House expected, the researchers found great discrepancy between the bank servicers that implement HAMP. For example, some servicers converted trial modifications into permanent ones as much as 80 percent of the time, while others did so for as little as 30 percent of borrowers. After stripping away other factors such as quality of the loans, the characteristics of the borrower, or regional differences such as companies with a lot of business in California or Florida, there will still huge discrepancies.

The researchers did find strong correlation between a servicer's success with HAMP and the operational skill it had before the program was introduced. Banks that previously had fewer loans per employee, more training for staff, and shorter wait times for phone calls took far more advantage of HAMP. Banks with weaker infrastructure previously— mostly the largest servicers—didn't take up the program en masse relative to the size of their portfolios. "The program incentives were not enough to make them invest more in the process," Piskorski says. Because the mortgage servicing market is very concentrated—Piskorski says 75 percent of loans are serviced by large banks—the program's impact was curtailed.

Much of the focus on helping homeowners has shifted from HAMP to the banks' $25 billion settlement over abusive foreclosure practices. The settlement's court-appointed monitor released his first report on Aug. 30 and found most of the borrower aid came from short sales, not modifications. In a short sale, homeowners still lose their home, though under less punitive terms than a foreclosure. Take HAMP and the settlement's early progress together, and fewer homeowners will get to stay in their homes.

39.     OneWest's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications. Instead, OneWest has put processes in place that are designed to foster delay, mislead homeowners and avoid modifying mortgage loans.

40.     Plaintiffs are just some of many homeowners who have been harmed by OneWest's improper, deceptive practices and purposefully ineffectual implementation of HAMP.

**Plaintiffs Harry and Judith Stratton**

41.     Plaintiffs Harry and Judith Stratton have been the owners of 1189 E. Burnett Street Stayton, Oregon, 97383 since July 17, 2000.  The property is the Stratton's primary residence.

42.     On April 1, 2007, the Strattons took out a $235,600 mortgage loan from Wilshire Credit.  On April 27, 2007, the servicing of the Stratton's mortgage loan was transferred to IndyMac and their loan continues to be serviced by OneWest.

43.     In 2008, as a result of a downturn in the economy, the Strattons started to encounter financial difficulties with their floor maintenance business and became fearful that they would be unable to make their monthly mortgage payments. In search of financial relief, the Strattons contacted IndyMac for a loan modification. After speaking with an IndyMac representative, the Strattons were instructed that the only way that they would be eligible for a loan modification was to miss three mortgage payments.

44.     Relying on IndyMac's advice and instructions (and continuing to experience financial hardship), in September 2008, the Strattons stopped making their loan payments so that they could restructure their loan.

45.     On December 16, 2008, IndyMac sent the Strattons a letter informing them that their loan was in serious default because they had not made their required mortgage payments. IndyMac told the Strattons that they had the right to cure their default by making a payment of $4,313.94.   The letter emphasized that "Time is of the essence!"

46.     On December 17, 2008, IndyMac sent the Strattons a letter informing them they had fallen behind on their mortgage payments and that it wanted to help them.  The letter explained in part, that IndyMac had "partnered with HOPE NOW's Project Lifeline, to assist our customers who are at risk of foreclosure and help them stay in their homes.  Through Project Lifeline,

[IndyMac] may be able to temporarily suspend the foreclosure process for 30 days while your mortgage loan is renegotiated or refinanced." The letter also suggested that the Strattons contact IndyMac to speak to a Loan Counselor.

47. The Strattons immediately contacted a representative from HOPE NOW's Project Lifeline and discussed their financial situation. Throughout the remainder of December, the Strattons had several calls and provided numerous documents to HOPE NOW in an effort to get assistance with a loan modification from IndyMac. HOPE NOW's efforts were completely ineffective.

48. On December 31, 2008, IndyMac sent the Strattons a letter informing them that they had fallen behind on their mortgage payments and that they might be able to qualify for a number of loss mitigation options, including a repayment plan, loan modification, pre-foreclosure sale or short payoff or deed in lieu of foreclosure. The letter encouraged the Strattons to contact IndyMac for assistance.

49. On January 1, 2009, the Strattons contacted IndyMac and talked to a Loan Counselor regarding their finances and loss mitigation options. During that call, the Strattons emphasized that they wanted to keep their home and simply needed assistance to temporarily reduce their monthly mortgage payments. At that time, the Strattons requested that IndyMac provide them with a loan modification.

50. On January 2, 2009, IndyMac sent the Strattons a letter regarding their request for a loan modification. The letter stated that, in order for IndyMac to review their request for a modification, the Strattons needed to send IndyMac copies of certain documents, including a Financial Statement, Hardship Explanation forms, most recent checking and savings account statements, proof of all sources of household income or a profit and loss statement if self-

employed, and any other documents or information relevant to the situation.  The letter explained that once IndyMac received the Stratton's documents, a Workout Analyst would be assigned to review their file and that they would be contacted within 30 days.  In compliance with IndyMac's request for information regarding a loan modification, the Strattons immediately pulled together all of the requested documents and sent the material to IndyMac.

51.     On January 15, 2009, the Strattons received two identical letters from IndyMac explaining that their loan was in serious default and that the amount due to cure their default was $4,293.01 (due on or before February 16, 2009).  The letter mistakenly stated that their "Next Payment Due Date was December 1, 2008" and emphasized that "Time is of the essence!"

52.     On January 16, 2009, the Strattons received a letter from IndyMac that was identical to the letter they had received on December 17, 2008.  The letter encouraged the Strattons to contact a HUD-approved housing counseling agency or a local housing counseling agency.  Based on IndyMac's advice, in an effort to get assistance with a loan modification, several days later, the Strattons contacted Novadebt, a local non-profit social financial management organization and the partner of the Homeownership Preservation Foundation.  Novadebt agreed to work with the Strattons to attain a loan modification from IndyMac.

53.     On January 30, 2009, IndyMac sent the Strattons a letter identical to the one received on December 31, 2008, informing them that they had fallen behind on their mortgage payments and that they might be able to qualify for a number of loss mitigation options, including a repayment plan, loan modification, pre-foreclosure sale or short payoff or deed in lieu of foreclosure.

54.     On February 3, 2009, the Strattons, with the assistance of a representative from Novadebt, began telephone negotiations with IndyMac for a home loan modification.  During the

call, the Strattons provided IndyMac with financial information and were told that IndyMac would review their account for a loan modification.

55.     On March 6, 2009, the Strattons received a letter from IndyMac's "Workout Specialist" Debra Rodriguez explaining that she was reviewing their request and application for a loan modification. The letter stated: "In order to continue, I need additional information from you. If I have not received the documents from you within 10 days from the date of this letter, I will assume you are no longer interested in pursuing a workout. The documents needed are as follows: Completed borrower hardship letter and Proof of income for all household sources (60 days)."

56.     On March 16, 2009, the Strattons faxed to Ms. Rodriguez all of the requested documentation. That day, the Strattons contacted IndyMac to confirm that IndyMac had received the documents. During that call, they were informed by an IndyMac representative that IndyMac had received the documents and was working on a modification that would take 30 to 60 days. The Strattons were instructed to "stay patient."

57.     On April 10, 2009, the Strattons received a letter from IndyMac informing them that, effective March 19, 2009, the servicing of their mortgage, had been assigned, sold or transferred from IndyMac Federal Bank, FSB to IndyMac Mortgage Services, a division of OneWest Bank, FSB.

58.     Despite the fact that the Strattons were already working with IndyMac on a loan modification, on April 23, 2009, IndyMac sent the Strattons an identical letter to the one they had received on January 30, 2009, informing them yet again that they had fallen behind on their mortgage payments and that they might be able to qualify for a number of loss mitigation options, including a repayment plan, loan modification, pre-foreclosure sale or short payoff or deed in lieu of foreclosure.

59.     At the end of April 2009, the Strattons contacted OneWest to determine the status of their application for a loan modification. During a call with one of OneWest's representatives, the Strattons were refused access to Ms. Rodriguez or anyone in IndyMac's loss mitigation department.  Instead they were told by the representative that OneWest did not have any records of their financial documentation or application.   The OneWest representative demanded that the Strattons resend all documents regarding their application for a loan modification.

60.     In an effort to find out if OneWest had really lost all of their paperwork, throughout April the Strattons repeatedly contacted OneWest.  On multiple occasions, the Strattons left voice mail messages that were never returned.  When the Strattons were able to reach OneWest, it was the same story --- always a different representative who had no knowledge of their history or application for a loan modification.   Each representative would give the Strattons the same instruction which was to resend all documents regarding their application for a loan modification.

61.     On May 4, 2009, the Strattons decided to resend OneWest all of their documents supporting their application for a loan modification.

62.     Adding to their frustrations with IndyMac and after months of trying to obtain a loan modification, on May 5, 2009, the Strattons were shocked when they received in the mail a Notice of Foreclosure which explained that they needed to pay $16,121.16 in order bring their mortgage loan current.  The Notice stated that the Strattons' home would be sold on September 8, 2009 if they did not take action.  That same day, the Strattons also received a Trustee's Notice of Sale.

63.     In May 2009, the Strattons became very concerned and were extremely fearful that they would soon lose their home to foreclosure.  On May 11, 2009, with the assistance of Novadebt, the Strattons had a conversation with OneWest about their application for a loan

modification and the pending foreclosure proceeding. The OneWest representative informed the Strattons that OneWest was "backed up due to a new loan system" and could not comment on the status of the Strattons' application because she could not find their paperwork.

64.     On May 20, 2009, OneWest sent the Strattons a letter informing them that it had a number of programs designed to help borrowers who are struggling to make their mortgage payments. The letter also stated, "In order for us to review your situation and determine if you are eligible for one of our programs, please complete the enclosed financial packet and return this to us by fax or mail no later than 6/23/2009. ALL YOU HAVE TO DO IS: Step 1: Submit documentation of your income. Step 2: Return your financial packet to us by fax or by mail using the enclosed prepaid envelope. Once you have completed steps 1 and 2, you will be contacted by our Home Loan Servicing department within 30 days."

65.     The Strattons did not understand why OneWest was asking them again for documents that it already had in its possession. Incredibly frustrated and worried about the potential loss of their home, the Strattons once again sent OneWest all of the documentation requested in the May 20, 2009 letter.

66.     On June 4, 2009, the Strattons contacted OneWest to make sure everything was in order concerning their application for a modification. During a call with a OneWest representative, the Strattons were informed that OneWest had started processing their request for a modification on April 22, 2009 and that it needed at least 30 to 60 days to determine their eligibility. The OneWest representative also informed the Strattons that OneWest would push back their foreclosure date.

67.     On June 11, 2009, the Strattons contacted OneWest again to inquire about the status of their application for a loan modification. During a call with OneWest, the Strattons were

stunned when they were informed by a representative that OneWest had no records of their application or documentation. Once again, the Strattons were asked to resend all of their financial information to OneWest.

68.     At this time, the Strattons were incredibly angry and frustrated by OneWest's conduct and suspected that OneWest was intentionally losing their paperwork. Despite their frustrations, the next day, on June 12, 2009, the Strattons faxed and sent by registered mail all documents that had been requested by OneWest for a loan modification.

69.     On July 16, 2009, the Strattons contacted OneWest again to make sure their application was in order. During a call with one of OneWest's representatives, the Strattons were provided with no information. When they asked about their loan modification application, the representative said, "I cannot comment on that."

70.     After more than seven months of frustration with IndyMac/OneWest, on July 19, 2009, the Strattons sent a letter to their Attorney General asking for assistance with their request for a loan modification and IndyMac's planned foreclosure and sale of their home.

71.     By letter dated July 21, 2009, OneWest offered the Strattons a TPP Agreement under the HAMP. *See* Exhibit A attached hereto. That document was dated July 21 but was received in the mail by the Strattons on July 30, 2009. The July 21, 2009 letter explained that:

> We have enclosed a customized Home Affordable Modification Trial Period Plan ("*Trial Period Plan*"). If you qualify under the federal government's Home Affordable Modification program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure.

72.     The letter included a section entitled "Important Program Info." Under a section entitled NEW PRINCIPAL BALANCE, the Strattons were told that "If you fulfill the terms of the

trial period including, but not limited to, making the trial period payments, we will waive ALL unpaid late charges at the end of the trial period."

73.     To accept the TPP offer, the Strattons were required to make a new monthly payment of $1,609.31 for the next three months of the trial period (August 1, 2009, September 1, 2009 and October 1, 2009).  The Strattons were also required to send IndyMac two copies of the signed TPP, a completed Hardship Affidavit, a signed and dated IRS Form 4506-T, a copy of their most recent utility bill, and documentation verifying their income.  The letter stated that the Strattons "must send in both signed copies of the [TPP], all required income documentation, and your first trial payment by 7/27/2009."

74.     As part of the July 21, 2009 HAMP package, in a Frequently Asked Questions section, OneWest explained that after the trial period was complete, it could take up to 30 days to process the application:

> **Q.     How long will it take to process my modification request and determine if I qualify for the program?**
>
> It may take <u>up to 30 days</u> for us to receive and review your documents. We will process your modification request as quickly as possible.  Please note, however, that your modification will not be effective unless you meet all of the applicable conditions, including making all trial period payments.

75.     The Q&A section also explained that IndyMac would not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings had already started.

> **Q.     Will a foreclosure occur if I participate in the Home Affordable Modification program?**
>
> As long as you comply with the terms of the Trial Period Plan, we will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started.  If you fail to comply with the terms of the Trial Period Plan and do not make other arrangements, your loan will be enforced according to its original terms, which could include foreclosure.

76.    The opening paragraph of the TPP contract which is attached as Exhibit B hereto, stated the following:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section continue to be true in all material respects, then [OneWest] will be provide me with a Home Affordable Modification Agreement ("Modification Agreement") as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.
>
> ***
>
> I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer *or will send me written notice that I do not qualify for the Offer*.

77.    The language in the TPP emphasized that, "TIME IS OF THE ESSENCE under this Plan" and made clear that OneWest would suspend any scheduled foreclosure sale, so long as the Strattons continued to meet their obligations under the Plan.  The TPP contract also described the "Modification Effective Date" (*i.e.,* the date when OneWest would be required to inform the Strattons whether or not they were eligible for a permanent HAMP loan modification) as "the first day of the month following the month in which the last Trial Period Payment is due."   Thus, if the Strattons complied with all requirements of the TPP, they were entitled to be informed by OneWest about their eligibility for a permanent modification by no later than November 1, 2009.

78.    After receiving the TPP offer in the mail on July 30, 2009, the Strattons contacted OneWest with numerous questions about their prior applications for a modification. The Strattons did not understand why they needed to apply again for a loan modification when OneWest had received all of their information numerous times.   During that call, OneWest's representative refused to answer any questions about the Strattons prior applications for a loan modification. Since the Strattons had only received the TPP on July 30 and the TPP was required to be executed

and submitted to OneWest on July 27 (three days earlier), OneWest agreed to provide the Strattons with a seven day extension to consider the offer.

79.     Despite what they believed to be unfair dealings by IndyMac, the Strattons felt they had no choice but to once again provide all of their loan modification paperwork to OneWest. Accordingly, on July 31, 2009, the Strattons signed the TPP and mailed it, along with their first trial period payment in the amount of $1,609.31, to OneWest. The Strattons also sent OneWest all documents and information that were required under the TPP.

80.     In direct breach of the terms of the TPP, on August 12, 2009, the Strattons received a Notice of Intent to Remove and were informed that their home would be put up for sale on September 8, 2009.   The Strattons were stunned when they received the Notice of Intent to Remove because it was their understanding that they were finally in the process of modifying their loan and that their home could not be sold during the trial period. The Strattons immediately called to find out why OneWest would foreclose on their home when they were willing and able to make their loan payments and stay in their home. During a call with OneWest, the Strattons were told by a representative that OneWest had the right to file foreclosure papers in accordance with Oregon and or Marion County law.

81.     Fearful that they would soon lose their home to foreclosure, on August 24, 2009, the Strattons sent a letter and complaint to the Office of Thrift Supervision which described their experience with IndyMac.

82.     On August 25, 2009, the Strattons continued to fulfill their obligations under the TPP and sent OneWest their second trial period payment in the amount of $1,609.31.

83.     Despite OneWest's threat, the Strattons' home was not put up for sale on September 8, 2009.

84.    On September 9, 2010, the Strattons received a letter from the Office of Thrift Supervision informing them that it would conduct an analysis of their complaint which would be forwarded to OneWest for a response.

85.    On September 25, 2009, the Strattons received a letter from OneWest in response to their complaint with the Office of Thrift Supervision. OneWest informed the Strattons that the foreclosure sale of their home would be suspended while it reviewed their application for a permanent loan modification. OneWest explained that, "The Notice of Intent to Remove was simply sent prior to IndyMac processing the information and suspending foreclosure." The OneWest letter also requested that the Strattons fax to OneWest a profit and loss statement for the current quarter and a Social Security award letter for Harry Stratton.

86.    On September 30, 2009, the Strattons faxed to OneWest a profit and loss statement for the current quarter and a Social Security award letter for Harry Stratton. That same day, the Strattons also sent OneWest their third trial period payment in the amount of $1,609.31 --- completing their obligations under the TPP.

87.    By the end of October 2009, the Strattons had not heard back from OneWest about their HAMP application or whether or not they were eligible for a permanent HAMP modification. Desperate to keep their home, the Strattons contacted OneWest to find out whether they would receive their permanent mortgage modification and to inquire whether they should make a fourth trial payment. During a telephone call with OneWest, the Strattons were specifically instructed by a representative from OneWest not to make a fourth trial payment and to wait for a response from OneWest.

88.    Pursuant to the terms of the TPP, OneWest was required to respond to the Strattons by no later than November 1, 2009 regarding their eligibility for a permanent loan

modification. That never happened. On November 5, 2009, the Strattons sent another letter to the Office of Thrift Supervision which described IndyMac's conduct. The Strattons waited through November and never received a letter or telephone call from OneWest concerning the status of their application for a permanent HAMP modification.

89. On November 23, 2009, the Office of Thrift Supervision sent a letter to the Strattons explaining that OneWest had provided it with a copy of its September 25, 2009 letter. The Office of Thrift Supervision determined that OneWest's letter was responsive to their complaint and that it was closing the file on their case.

90. Despite the Strattons' compliance with the terms of the TPP Agreement, timely provision of all documents requested by IndyMac and timely payment of their TPP payments, by December 2009, they had still neither been considered for nor offered a permanent loan modification under the TPP or HAMP Program guidelines.

91. On December 3, 2009, OneWest sent the Strattons a letter explaining that their new balance on their home was $254,607.69, which reflected numerous late fees, interest and miscellaneous fees.

92. On December 7, 2009, the Strattons contacted OneWest to inquire about the status of their permanent loan modification and all of the fees that had been assessed. During that call, a representative from OneWest informed the Strattons that they had been denied a permanent HAMP modification. The representative refused to explain the reason for the denial. In violation of the TPP, the Strattons never received a written letter from OneWest explaining to them why they did not qualify for a permanent HAMP loan modification.

93. On December 21, 2009, the Strattons sent OneWest a dispute letter regarding the fees assessed on their home.

94.     By the end of December 2009, the Strattons turned to the Internet for assistance and found what appeared to be a legitimate company --- American Mortgage Relief to assist them with their application for a loan modification.  The Strattons paid American Mortgage Relief $1,995.00 to represent them in their negotiations with OneWest for a loan modification.

95.     On December 22, 2009, OneWest sent the Strattons a letter explaining that it was in receipt of their request to list Paul Horvat from American Mortgage Relief as an authorized party on their loan.

96.     During the months of January, February and March 2010, it was the Strattons' understanding that John Vartanian and Paul Horvat from American Mortgage Relief were in negotiations with OneWest about a loan modification.

97.     On March 23, 2010, the Strattons received a Trustee's Notice of Sale of their home. An auction for the sale of their home was set for July 26, 2010.  They were told that in order to bring their mortgage loan current, they would need to pay $37,483.18 or otherwise lose their home.

98.     Between March 2010 and May 2010, the Strattons contacted all of their local legislators.  As a result of their efforts, Congressman Kurt Schrader filed a congressional inquiry into their dealings with OneWest.  The Strattons also organized a two day demonstration on the steps of the Oregon State Capital and protested OneWest's deceptive business practices.

99.     On May 24, 2010, the Strattons received a letter from OneWest stating that it was reviewing their eligibility for the HAMP but could not complete its review because the information they had submitted was incomplete. Despite already having all of the Strattons' financial information, OneWest once again asked the Strattons to provide their most recent two months bank statements and a Request for Modification and Affidavit.  OneWest told the Strattons, "To avoid further delays in our review process, please submit the above items to us by 6/7/2010."

100.    Notwithstanding the fact that their application for a permanent HAMP modification should have been performed and completed months before (no later than November 1, 2009), the Strattons sent OneWest the requested documentation again on May 31, 2010.

101.    On July 2, 2010, the Strattons received a Notice of Intent to Remove and were informed that the Trustee's sale on their property was scheduled for July 26, 2010.

102.    Despite IndyMac's threat, the Strattons' home again was not put up for sale on July 26, 2010.

103.    On Monday, August 2, 2010 after 3:00 pm, the Strattons received a letter and package dated July 22, 2010 (despite the sensitive issues of timing, it was postmarked eight days later on Friday, July 30, 2010) from OneWest informing them that it was evaluating their mortgage for eligibility in the HAMP.  The package had a $0.44 postage stamp placed over a first class bulk stamp.  It appears that OneWest intentionally delayed the Strattons' receipt of the letter.  The letter explained that, "Your loan has been previously referred to foreclosure and we will continue the foreclosure process while we evaluate your loan for HAMP.  However, no foreclosure sale will be conducted and you will not lose your home during the HAMP evaluation."  Despite the fact that OneWest had already entered into a TPP with the Strattons and had all of their paperwork, OneWest asked the Strattons once again to provide numerous documents by August 5, 2010 (giving them only 1 day to pull together and send out the paperwork by overnight mail), in order to determine their eligibility for the HAMP and another trial period plan.  The letter made clear that if the Strattons did not qualify for HAMP, or failed to comply with the terms of the trial period plan, they would be sent a Non-Approval letter.  The letter also explained that if the Strattons were not approved, they would have 30 days to review the reason for non-approval.

104.    The short time frame to produce the requested documents caused the Strattons tremendous stress and anxiety, however, on August 4, 2010, once again the Strattons were able to send OneWest by overnight mail all required documentation.

105.    On August 18, 2010, the Strattons contacted OneWest to find out about the status of their application for a permanent loan modification.   They were told by a representative from OneWest that the "modification was in the system."

106.    On August 24, 2010, the Strattons filed another complaint against OneWest with the Office of Thrift Supervision.

107.    On August 25, 2010, the Strattons contacted OneWest and were told by a representative that they had been denied for a HAMP modification but that a "custom in-house offer for modification" had been sent out on August 24, 2010.  When the Strattons asked why they were denied for a permanent HAMP modification, the representative told them that they had never responded to OneWest's offer.   That of course made no sense, since the Strattons had made all of their trial payments on a timely basis and complied with all other obligations under the TPP. Moreover, for many months they had repeatedly submitted all of their paperwork to OneWest on multiple occasions.

108.    Contrary to the representations made by OneWest on August 25, one day later on August 26, 2010, the Strattons received a letter from OneWest regarding the status of their HAMP review.  The letter stated that the Strattons' modification packet had been received and was under review.  The Strattons were told to watch for a status letter in approximately 30 to 45 days.

109.    The very next day, on August 27, 2010, which was now more than a year after the Strattons had entered into a TPP with OneWest, the Strattons received a letter explaining that their loan did not qualify for HAMP.   The letter explained, "In reviewing your loan for a possible

modification, we have determined that your loan does not qualify for HAMP. Under the rules and guidelines of HAMP, loans that have previously started, but have not completed, a HAMP trial modification are not eligible for additional modification." The letter made no sense because the Strattons had completed all of their obligations under the TPP.

110. After their grueling ordeal with OneWest, the Strattons would not accept OneWest's denial and continued to demand a modification. During the next several months, OneWest continued to demand the same documents that the Strattons had been providing to IndyMac and OneWest for several years. On November 19, 2010, the Strattons were offered a non-HAMP loan modification which incorporated "delinquent payments for the months of 12/1/2008 through 12/1/2010."

111. Exhausted from years of fighting with OneWest and desperate to keep their home, on December 2, 2010, the Strattons reluctantly signed the non-HAMP loan modification so that they could keep their home. The Stratton's new loan is a 40 year note compared to their original 30 year mortgage. Their monthly payments are now $1,598.52 (an amount which is less than the amount paid during the TPP).

112. When the Strattons started to seek a loan modification, they had approximately $80,000 to $100,000 of equity in their home. As a result of OneWest's conduct, after entering into the non-HAMP modification, with all of the penalties, interest (approximately $50,000), late fees and miscellaneous fees, the Strattons were left with no equity in their home.

113. In breach of the TPP, the Strattons never received any type of written notice explaining why they did not qualify for a permanent loan modification. Although the Strattons demanded an explanation for the denial, none of OneWest's representatives have ever been able to provide them with an adequate explanation.

114.    During the TPP period, and thereafter, OneWest reported the Strattons' loan as delinquent to credit bureaus, and as a result, their credit scores were negatively affected. OneWest breached its promise under the TPP to consider the Strattons for a loan modification in a timely manner and to permanently modify their loan if they were eligible. Like other borrowers, despite their acceptance of and performance under their contract with OneWest, compliance with HAMP requirements and their continued monthly payments under the TPP, the Strattons never received a permanent loan modification or a timely written explanation why they were denied.  OneWest's intentional and systematic failure to even respond to homeowners and breach of its promise to consider HAMP modification applications and give homeowners determinations one way or the other, has undercut the entire purpose of HAMP and has caused substantial injury to the Strattons and the class they seek to represent.

**Plaintiffs Matthew and Jennifer Copthorne**

115.    Plaintiffs Matt and Jennifer Copthorne were previously the owners of a home located at 3805 Blackburn Rd. NW, Canton, Ohio 44718.  The property was the Copthornes' primary residence.

116.    On June 11, 2004, Jennifer Copthorne took out a $208,000 mortgage loan from IndyMac.  The Copthornes' loan was serviced by IndyMac and OneWest until their home was improperly sold on November 11, 2010.

117.    On August 26, 2009, Jennifer Copthorne received an unsolicited letter and loan modification packet from OneWest.  At the time, the Copthornes were not seeking a loan modification.  The letter which was dated August 17, 2009, offered the Copthornes a TPP Agreement under the HAMP.  *See* Exhibit C attached hereto.   OneWest's August 17, 2009 letter explained to the Copthornes that:

> We have enclosed a customized Home Affordable Modification Trial Period Plan ("*Trial Period Plan*"). If you qualify under the federal government's Home Affordable Modification program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure.

Although the Copthornes were not seeking a loan modification and could afford to pay their monthly loan payment of $1,711.00, they were intrigued by OneWest's offer because they had been experiencing financial troubles due to a downturn in the economy.

118.   The letter included a section entitled "Important Program Info."  Under a section entitled NEW PRINCIPAL BALANCE, the Copthornes were told that "If you fulfill the terms of the trial period including, but not limited to, making the trial period payments, we will waive ALL unpaid late charges at the end of the trial period."

119.   To accept the offer, the Copthornes were required to make a new monthly payment of $1,298.78 for the next three months of the trial period (September 1, 2009, October 1, 2009 and November 1, 2009).  The Copthornes were also required to send OneWest two copies of the signed TPP, a completed Hardship Affidavit, a signed and dated IRS Form 4506-T, copy of their most recent utility bill, and documentation verifying their income.  The letter stated that the Copthornes "must send in both signed copies of the [TPP], all required income documentation, and your first trial payment by 8/24/2009."

120.   As part of the HAMP package, in a Frequently Asked Questions section, OneWest explained that after the trial period was complete, it could take up to 30 days to process their application for a permanent modification:

> **Q.   How long will it take to process my modification request and determine if I qualify for the program?**
>
> It may take <u>up to 30 days</u> for us to receive and review your documents. We will process your modification request as quickly as possible.  Please note, however, that your modification will not be effective unless you

meet all of the applicable conditions, including making all trial period payments.

121.     The Q&A section also explained that during the trial period OneWest would not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings had already started.

> **Q.     Will a foreclosure occur if I participate in the Home Affordable Modification program?**
>
> As long as you comply with the terms of the Trial Period Plan, we will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started.  If you fail to comply with the terms of the Trial Period Plan and do not make other arrangements, your loan will be enforced according to its original terms, which could include foreclosure.

122.     The opening paragraph of the TPP contract, which is attached as Exhibit D hereto, stated the following:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section continue to be true in all material respects, then [OneWest] will provide me with a Home Affordable Modification Agreement ("Modification Agreement") as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.
>
> ***
>
> I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer *or will send me written notice that I do not qualify for the Offer*. (Emphasis added).

123.     The language in the TPP emphasized that, "TIME IS OF THE ESSENCE under this Plan" and made clear that OneWest would suspend any scheduled foreclosure sale, so long as the Copthornes continued to meet their obligations under the TPP.  The TPP contract also described the "Modification Effective Date" (*i.e.*, the date when OneWest would be required to inform the Copthorne's whether or not they were eligible for a permanent HAMP loan

33

modification) as "the first day of the month following the month in which the last Trial Period Payment is due."  Thus, if the Copthornes complied with all requirements of the TPP, they were entitled to be informed by OneWest about their eligibility for a permanent modification by no later than December 1, 2009.

124.    Since the Copthornes only received the TPP offer in the mail on August 26, 2009 and the time for their response had passed (August 24, 2009), they contacted OneWest to seek an extension.  During a telephone call with OneWest, the Copthornes were told by a representative that the offer was still valid and to return the executed TPP and required documents and to start the trial payments as soon as possible.

125.    On August 26, 2009, Jennifer Copthorne signed the TPP and mailed it to OneWest along with the Copthornes' first trial period payment in the amount of $1,298.78 and all required income documentation.

126.    OneWest sent the Copthornes a copy of the TPP Agreement which was executed by Michael Stanford, First Vice President of OneWest on September 8, 2009.  *See* Exhibit D.

127.    In September 2009, the Copthornes contacted OneWest to set up an automatic bank draft so that their future trial payments would be automatically and directly deposited to OneWest.

128.    On October 1, 2009, the Copthornes' second trial period payment of $1,298.78 was withdrawn from their checking account by OneWest.

129.    On October 30, 2009, the Copthornes' third trial period payment of $1,298.78 was withdrawn from their checking account by OneWest.

130.    Throughout the month of November 2009, the Copthornes did not hear from OneWest about their TPP or whether or not they were eligible for a permanent HAMP modification.  The Copthornes contacted OneWest on a weekly basis and were told that their

application was being processed. When the Copthornes asked OneWest what they should do if they did not receive a response by the end of November, they were instructed by a representative to continue to make their same trial payments.

131. Pursuant to the terms of the TPP, OneWest was required to respond to the Copthornes by no later than December 1, 2009 regarding their eligibility for a permanent HAMP loan modification. That never happened. Despite the Copthornes' compliance with the terms of the TPP Agreement, timely provision of all documents requested by OneWest and timely payment of their TPP payments, by December 1, 2009, they had still neither been considered for nor offered a permanent loan modification under the terms of the TPP and HAMP program guidelines.

132. On December 1, 2009, the Copthornes' fourth trial period payment of $1,298.78 was withdrawn from their checking account by OneWest. Once again, throughout December 2009 the Copthornes called OneWest on a weekly basis to inquire about the status of their eligibility for a permanent HAMP loan modification. During various calls with different OneWest representatives, the Copthornes were informed that their application was being processed and that a decision had not been made.

133. On January 1, 2010, the Copthornes' fifth trial period payment of $1,298.78 was withdrawn from their checking account by OneWest. Once again, throughout January 2010, the Copthornes called OneWest on a weekly basis to inquire about the status of their eligibility for a permanent HAMP loan modification. During various calls with different OneWest representatives, the Copthornes were informed that their application was being processed and that a decision had still not been made.

134. On February 1, 2009, the Copthornes contacted OneWest to inquire about the status of their application for a permanent HAMP loan modification and whether they should make a

sixth trial period payment. During that telephone call, a representative from OneWest informed the Copthornes that their trial period had expired and that OneWest would no longer accept any trial payments. The Copthornes asked whether they had been granted a permanent HAMP modification. In response to their inquiry, the OneWest representative informed the Copthornes that they had been denied and had no explanation for their denial. In addition to being told that they had been denied a permanent HAMP modification, the Copthornes were also told that their home was currently in foreclosure and that the only way to stop the foreclosure proceeding and sale of their home was to immediately make a payment to OneWest in excess of $20,000. The Copthornes were shocked by OneWest's response because they had never received any type of notice of foreclosure. During the call, the Copthornes explained to OneWest that they were willing and able to make their original loan payment of $1,711. That offer was immediately rejected. Frustrated by their conversation with the OneWest representative, the Copthornes terminated the telephone conversation so that they could speak to a different representative. After reaching another OneWest representative, the Copthornes were provided with the same instructions that their home was in foreclosure and that the only way for a sale of their home to be stopped was to make a payment in excess of $20,000. The Copthornes then asked to speak to a supervisor, but that request was denied.

135.    The Copthornes were stunned by their denial and could not find out why they had not received a permanent HAMP modification. They were perplexed by OneWest's actions and did not understand how OneWest could take away their home as a result of their participation in the TPP --- especially since they had been solicited to participate by OneWest and were willing and able to make their original loan payments.

136.    In breach of the TPP, the Copthornes never received any type of written notice explaining why they did not qualify for a permanent loan modification. Although the Copthornes demanded an explanation for the denial, none of OneWest's representatives were able to provide them with an adequate explanation.

137.    Throughout the months of April and May 2010, the Copthornes contacted OneWest on numerous occasions in an effort to explain that foreclosure was unfair and unnecessary since they were willing to make their original loan payment of $1,711.  Once again, the Copthornes were told that OneWest would not accept those payments unless they were willing to make a payment in excess of $20,000.

138.    On May 10, 2010, the Copthornes were served with foreclosure papers by OneWest.

139.    On June 4, 2010, the Copthornes contacted OneWest yet again in an attempt to explain that they were willing to make their original loan payment of $1,711 and that foreclosure was unfair, unnecessary and that they wanted to keep their home.  During that call, a representative from OneWest rejected the Copthornes' offer to make their original loan payment of $1,711 and suggested that they provide OneWest with a copy of their financial hardship letter and their most recent paystubs.  The Copthornes did not understand why OneWest was asking for this information yet again, but complied and faxed the documents to OneWest the same day.

140.    On June 8, 2010, the Copthornes filed a response to the foreclosure action with the Stark County Court.  A copy of that letter was sent to Manley, Deas, Kochalski LLC (OneWest's foreclosure attorney).  The response explained the Copthornes' history with IndyMac/OneWest and their willingness to make original payments on their loan and work on a solution.

141.    On June 11, 2010, OneWest's Motion for a Default Judgment was granted.  The Copthornes never received any type of notice of a hearing nor were they informed about the judgment.

142.    On June 18, 2010, Toni Varda, a legal assistant at Manley, Deas, Kochalski LLC contacted the Copthornes via e-mail and asked them to fill out yet another loan modification form in order to "possibly settle this case."

143.    On June 21, 2010, the Copthornes had a telephone conversation with Toni Varda. During that call, the Copthornes once again explained that they had applied for a HAMP modification and participated in the trial period plan back in August 2009, fulfilled all of their obligations and never received a decision from OneWest.  Ms. Varda informed the Copthornes that she would look into the situation and get back to them.  After that call, the Copthornes never heard back from Ms. Varda or OneWest until September 2011.  All voice mail messages that the Copthornes left for Ms. Varda or OneWest were never returned.

144.    On September 22, 2011, the Copthornes received a telephone call from Kerri Blevins from Manley, Deas, Kochalski.  Ms. Blevins asked the Copthornes if they were willing to try to work something out before a Court mediation which was scheduled for the next day.  This was the first time that the Copthornes had heard about any type of Court mediation.  At this point in time, the Copthornes were in Las Vegas, where Matt Copthorne was on a temporary job assignment.  The Copthornes informed Blevins that they had been waiting to hear back from OneWest for many months and of course were willing to work something out.  The Copthornes also told Blevins that it was impossible for them to get to Canton, Ohio by the next morning for the Court mediation and asked to reschedule.  Without any explanation, Blevins informed the Copthornes that she would not reschedule the mediation.  After the call, the Copthornes

immediately faxed a letter to the Stark County Clerk of Court and Manley, Deas, Kochalski asking to reschedule the mediation. There was no response from the County Clerk or OneWest or its attorneys.

145.    On November 11, 2010, the Copthornes' home was sold at Sherriff's Sale for $232,913.94. At that time, the balance on their mortgage was $208,000. The Copthornes had never received any notice of the Sherriff's Sale. It was not until March 2011 when Matthew Copthorne's mother was driving by their property and noticed that a crew of workers were removing side shingling from their house, that the Copthornes actually learned that their home had been sold. After finding out their home had been sold, the Copthornes learned that many of their personal items, business records, furniture and equipment had been cleared out or taken from them. The Copthornes had been paying their utility bills up until March 2011 when they discovered that their home had been sold.

146.    During the TPP period, and thereafter, OneWest reported Jennifer Copthorne's loan as delinquent to credit bureaus, and as a result, her credit scores were negatively affected. OneWest breached its promise under the TPP to consider the Copthornes for a loan modification in a timely manner and to permanently modify their loan if they were eligible. Like other borrowers, despite their acceptance of and performance under their contract with OneWest, compliance with HAMP requirements and their continued monthly payments under the TPP Agreement, the Copthornes never received a permanent loan modification or a written explanation of why they had been denied. As result of OneWest's egregious conduct, the Copthornes lost their home through a foreclosure and sale. OneWest's intentional and systematic failure to even respond to homeowners and breach of its promise to consider HAMP modification applications and give homeowners

determinations one way or the other, has undercut the entire purpose of HAMP and has caused substantial injury to the Copthornes and the class they seek to represent.

**Plaintiff Trina Little**

147.    Plaintiff Trina Little was previously the owner of a home located at 3636 Dovetail Lane, Lakeland, Florida 33813.  The property was Little's primary residence, but was improperly foreclosed on and sold by OneWest.  As a result of OneWest's deceptive and improper practices, Little lost her home and for several months was forced to temporarily live in a homeless shelter.

148.    On November 21, 2005, Little executed a $135,000 mortgage loan with IndyMac for the purchase of her residence.  Little's mortgage loan was serviced by IndyMac and OneWest until her home was sold.

149.    In December 2007, as a result of a downturn in the economy, Little lost her job. Around the same time, Little started caring for her mother who was diagnosed with terminal lung cancer.  By July 2008, Little was encountering serious financial difficulties and became fearful that she would be unable to make her monthly mortgage payments.

150.    In search of financial relief, Little contacted IndyMac to seek assistance with a loan modification.  After speaking with an IndyMac representative in July 2008, Little was instructed the only way that she would be eligible for a loan modification was to miss three mortgage payments. Relying on IndyMac's advice and instructions (and continuing to experience financial hardship), in September 2008, Little stopped making her loan payments so that she could restructure her loan.

151.    Between October 2008 and December 2009, Little continued to receive her monthly mortgage statement and late notices.  Each month, when she received these notices she would immediately call OneWest to speak to a customer service representative.  Each month, different

OneWest representatives would tell her the same thing --- not to worry about the late notices and to disregard the statements because after missing three months of payments she would become eligible for a loan modification.

152.     On January 7, 2009, OneWest sent a letter to Little (which she did not receive until January 21, 2009) enclosing a Modification Agreement.  The letter explained that OneWest was willing to permanently modify Little's mortgage, bring past due amounts current, and provide her with an affordable monthly payment.  In order to get a modification, Little was instructed to do the following:

> **What you do**.
>
> **All it takes for you to bring your mortgage current and confirm you qualify for this modified mortgage is to**:
>
> 1. Sign and return the enclosed Modification Agreement along with a check for $519.65 to be credited for your monthly principal and interest payment and
>
> 2. Provide verification of your income to confirm that you qualify for the proposed modification offer.
>
> If your verified income is different from our information, we will contact you to discuss a different modification offer to your mortgage that may help you keep your home.  We want to help you stay in hour home, so please return the signed Modification Agreement, your check, and verification of your income by 1/31/2009.

153.     On January 27, 2009, Little executed and mailed her Modification Agreement, all required paperwork and a check for $519.65 to IndyMac.

154.     On February 18, 2009, Little received a letter from IndyMac explaining that it would not modify her loan.  The letter explained in part:

> Modifications are considered when all of the following criteria are met:
>
> -    Foreclosure is possible if no action is taken and the borrower can afford a new payment structure;

- The loan is seriously delinquent and was not deliberately made delinquent by a borrower unwilling to make payments
- The credit score of the borrower has been negatively impacted, making new financing difficult to obtain
- The home must be owner occupied and not an investment property or second home
- A modification has not been previously made on the loan

Your request for a modification was reviewed but IndyMac Federal Bank is not able to modify your loan terms because the financial data you submitted did not show a hardship and actually demonstrates that you can afford to continue to pay your monthly mortgage payments under the terms of your Note. In addition, all of the conditions listed above must be met before a modification will be considered.

155. Little received another letter from IndyMac dated February 18, 2009 explaining that the funds used to make her monthly mortgage payment had been returned as non-sufficient funds.

156. Little was perplexed by IndyMac's response to her application because she thought she met all of the criteria for a modification. Just one week later, Little received a letter dated February 26, 2009 from IndyMac stating that she had fallen behind on her mortgage payments and that it might be able to offer her loss mitigation options such as a repayment plan, loan modification, pre-foreclosure sale or short payoff.

157. Despite receiving a solicitation that IndyMac could help Little with "loss mitigation options," on March 13, 2009, Little received a summons and foreclosure complaint.

158. On April 3, 2009, Little received a letter (very similar to the January 7, 2009 letter) enclosing a second Modification Agreement. The letter explained that it was her "Final Notice" and that OneWest was willing to permanently modify her mortgage, bring past due amounts current, and provide here with an affordable monthly payment. The offer was generally the same as the January 2009 Modification Agreement, but this time Little's modified mortgage payment would be $542.66 (compared to the previous offer of $519.65). OneWest demanded that all of Little's paperwork be resubmitted again by June 26, 2009.

159.    On April 10, 2009, Little received a letter from IndyMac informing her that effective March 19, 2009, the servicing of her mortgage, had been assigned, sold or transferred from IndyMac Federal Bank, FSB to IndyMac Mortgage Services, a division of OneWest Bank, FSB.

160.    On April 21, 2009, Little executed and mailed her second Modification Agreement, all required paperwork and check for $542.66 to IndyMac.

161.    Several weeks later, on May 4, 2009, IndyMac sent Little a letter explaining that it would not modify her loan.  In contrast to the February 18 letter where IndyMac denied her request for a modification because she could not show hardship and could afford her monthly payments, this letter explained that she did not have enough income to support a modification:

> Modifications are considered when all of the following criteria are met:
>
> -    Foreclosure is possible if no action is taken and the borrower can afford a new payment structure;
> -    The loan is seriously delinquent and was not deliberately made delinquent by a borrower unwilling to make payments
> -    The credit score of the borrower has been negatively impacted, making new financing difficult to obtain
> -    The home must be owner occupied and not an investment property or second home
> -    A modification has not been previously made on the loan
>
> Your request for a modification was given thorough consideration, but IndyMac Mortgage Services, a division of OneWest Bank, FSB is not able to modify your loan terms at this time because **_we have determined that you do not have enough income to support the new loan payments or to support the additional funds needed to satisfy a repayment plan_**.

162.    On May 13, 2009, Little received a letter from IndyMac returning her check for $542.66 because that amount remitted did not represent her full loan payment.

163.    On May 30, 2009, Little applied a third time for a loan modification and resubmitted all of her financial information and paperwork to OneWest.

164.    On July 17, 2009, Little received a letter from OneWest denying her request for a loan modification.  The letter did not explain the reason for her denial.  The letter also explained that, "Please note that your case may be re-evaluated at a future date.  To enable us to re-evaluate your case, please keep us appr[a]ised of any material changes in your financial situation or monthly living expenses."

165.    On October 7, 2009, Little sent a letter to OneWest explaining her history regarding a loan modification.  The letter emphasized Little's sincere desire to stay in her home while fulfilling all of her past and future financial obligations.

166.    On October 14, 2009, Little received a Notice of Hearing and Motion for Summary Final Judgment of Foreclosure papers.  The hearing was scheduled for November 9, 2009.

167.    By the middle of October 2009, Little started a new job and her financial situation started to improve. Little did not want to lose her home and was willing to meet all of her financial obligations under her original loan. During a telephone call with one of OneWest's representatives, Little explained that her employment situation had changed.  She was instructed by the representative to reapply for a loan modification.

168.    On October 29, 2009, Little provided OneWest updated financial information and reapplied once again for a loan modification.

169.    Between October 29, 2009 and November 17, 2009, Little held numerous conversations with a OneWest loan representative about her account.  In fact, after hearing Little's story, that representative provided her with his personal e-mail address.  On several occasions, Little and the OneWest representative conducted online yahoo chat conversations.  Those conversations provide insight into the modification practices at OneWest:

Little:        What are the chances of me getting the loan modification approved with OneWest in the next 90 days (realistically) rather than filing [for bankruptcy]?

OneWest rep:  Not good. Loan mods are by the numbers and investor if you don't get one it is because of one or the other. There were 5 million people applying and 2000 loan mods nation wide last month.

Little:        Is mine not being picked up because of the numbers or because the loan is with a private investor?

OneWest rep:  Private investor.

Little.        Gotcha…so the numbers are in line it's just the fact that private investor owns my loan

OneWest rep:  We have gone back a number of times but this investor doesn't appear to want to agree to anything

Little:        That makes sense now…so it doesn't matter what I do with the numbers I'm still going to be declined.

OneWest rep:  Yes but that can help you in bankruptcy judges are getting fed up with it and Florida is kinda the focal point.

                        ***

OneWest rep:  So how is your new job?

Little:        Actually going very well…I'm working for an attorney now and he's actually trying to help mw with all this.

OneWest rep:  That is good! Just remember [OneWest] [does] not negotiate till forced to [go] through the court…up until then they will bully you.

Little:        I will remember that…all I needed is to know what I had to do…then I can and will do it…

OneWest rep:  But they make tons of mistakes! Just think back to how many different answers you have gotten from the same call center. You can call back 5 times and get 5 different answers.

                        ***

Little:          It still doesn't make sense to me though, why an investor wouldn't want to negotiate a repayment plan rather than have another home on the market that can't be sold…

OneWest rep:  They can write the loan off and all costs as [a] tax loss, sell your debt to someone else and still [sell] the property.

Little:          I appreciate all your help and I will fight if that's what I have to do…makes sends again…

OneWest rep:  they make money on [foreclosure] sales

170.    On November 9, 2009, Little attended a hearing before Judge Charles B. Curry regarding her foreclosure proceedings.  At the hearing, OneWest agreed to extend setting a sale date for Little's home by 90 days in order to negotiate an alternative solution to her foreclosure but would not agree to stop the foreclosure proceedings.

171.    On November 13, 2009, Little sent a letter to OneWest's foreclosure attorney Courtney Jared Bannan confirming the 90 day extension so that she could work out a solution with OneWest regarding her mortgage.

172.    By letter dated December 31, 2009, OneWest offered Little a TPP Agreement under the HAMP.  *See* Exhibit E attached hereto.   The December 31, 2009 letter explained that:

> We have enclosed a customized Home Affordable Modification Trial Period Plan ("*Trial Period Plan*"). If you qualify under the federal government's Home Affordable Modification program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure.

173.    The letter included a section entitled "Important Program Info."  Under a section entitled NEW PRINCIPAL BALANCE, Little was told that "If you fulfill the terms of the trial period including, but not limited to, making the trial period payments, we will waive ALL unpaid late charges at the end of the trial period."

174.    To accept the TPP offer, Little was required to make a new monthly payment of $806.84 for the next three months of the trial period (February 1, 2010, March 1, 2010 and April 1, 2010) and provide paperwork.  Little was also required to send OneWest two copies of the signed TPP, a completed Hardship Affidavit, a signed and dated IRS Form 4506-T, copy of her most recent utility bill, and documentation verifying her income.  Little was required to let OneWest know no later than 1/23/2010 that she accepted the TPP.

175.    As part of the December 31, 2009 HAMP package, in a Frequently Asked Questions section, OneWest explained that after the trial period was complete, it could take up to 30 days to process the application:

> **Q.    How long will it take to process my modification request and determine if I qualify for the program?**
>
> It may take <u>up to 30 days</u> for us to receive and review your documents. We will process your modification request as quickly as possible.  Please note, however, that your modification will not be effective unless you meet all of the applicable conditions, including making all trial period payments.

176.    The Q&A section also explained that IndyMac would not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings had already started.

> **Q.    Will a foreclosure occur if I participate in the Home Affordable Modification program?**
>
> As long as you comply with the terms of the Trial Period Plan, we will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started.  If you fail to comply with the terms of the Trial Period Plan and do not make other arrangements, your loan will be enforced according to its original terms, which could include foreclosure.

177.    The opening paragraph of the TPP contract which is attached as Exhibit F hereto, stated the following:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section continue to be true in all material respects, then

> [OneWest] will provide me with a Home Affordable Modification Agreement ("Modification Agreement") as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.
>
> ***
>
> I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer **or will send me written notice that I do not qualify for the Offer**.

178.    The language in the TPP emphasized that, "TIME IS OF THE ESSENCE under this Plan and made clear that OneWest would suspend any scheduled foreclosure sale, so long as Little continued to meet her obligations under the Plan.  The TPP contract also described the "Modification Effective Date" (*i.e.*, the date when OneWest would be required to inform Little whether or not she was eligible for a permanent HAMP loan modification) as "the first day of the month following the month in which the last Trial Period Payment is due."  Thus, if Little complied with all requirements of the TPP, she was entitled to be informed by OneWest about her eligibility for a permanent modification by no later than May 1, 2010.

179.    On January 19, 2010, Little signed the TPP and sent it to OneWest via UPS on January 22, and also made her first trial period payment in the amount of $806.84 to OneWest. Little also sent and faxed OneWest all documents and information required under the TPP.

180.    On February 1, 2010, Little received a letter from OneWest explaining that it was missing certain information from her and requested a copy of the Borrower Hardship form and a contribution letter from the person contributing to her mortgage.  Little did not understand how OneWest could be missing these documents because she had sent them as part of her January 22 fax and UPS package.  In fact, Little's fax which included all of the requested documents was confirmed as received.  Little resent the requested documents.

181.    In February 2010 (prior to her March 1, 2010 deadline), Little continued to fulfill her obligations under the TPP and sent OneWest her second trial period payment in the amount of $806.84.

182.    In March 2010 (prior to her April 1, 2010 deadline), Little continued to fulfill her obligations under the TPP and sent OneWest her third trial period payment in the amount of $806.84.

183.    In April 2010, Little continued to fulfill her obligations under the TPP and sent OneWest her fourth trial period payment in the amount of $806.84.

184.    Pursuant to the terms of the TPP, OneWest was required to respond to Little by no later than May 1, 2010 regarding her eligibility for a permanent loan modification.  That never happened.  Instead, on May 14, 2010, Little received a letter from IndyMac explaining that it had received her monthly mortgage payment but that one payment had been returned as insufficient. Little sent another check to cover the check that had been returned.

185.    On June 30, 2010, Little received a letter from OneWest explaining that it had reviewed her request for a loan modification but that it could not accommodate her request for a modification.  It is unclear whether the rejection letter related to the TPP and HAMP program.  In breach of the TPP, the letter did not explain why Little failed to qualify for a permanent modification under the HAMP.

186.    By letter dated July 13, 2010, OneWest asked Little to apply again for a loan modification under the HAMP and required her to resubmit all of her documents and financial information.  *See* Exhibit G attached hereto.  The letter explained in part,

> As your mortgage loan servicer, we will work with you in an effort to help find a foreclosure alternative that works for you.  In order for us to review your situation and determine if you are eligible for HAMP or one of our

other programs, please complete the enclosed financial packet and return this to us by fax or mail.

Once we have received all of the required information, you will be contacted by us within 30 days. To avoid delays in our review process, please complete all required steps in this packet and include all required documentation. Any incorrect or incomplete information will delay our review process. If it is determined that you do not qualify fro one of our loan modification programs, we may be able to offer you an alternative to foreclosure such as a short sale or repayment plan.

187.    On July 23, 2010, Little sent a letter to OneWest which once again included all of the paperwork and financial information that she had previously provided to OneWest as part of her HAMP application.

188.    In a letter dated August 19, 2010, OneWest informed Little that it had received her modification paperwork and that no additional information was needed. The letter explained that her file had been assigned to a Loss Mitigation Specialist for review. The review was expected to be completed within 30 calendar days.

189.    Just one day later, on August 20, 2010, OneWest sent Little a letter denying her request for a modification. The letter stated in relevant part:

Modifications are considered when all of the following criteria are met:

- Foreclosure is possible if no action is taken and the borrower can afford a new payment structure
- The loan is seriously delinquent and was not deliberately made delinquent by a borrower unwilling to make payments
- The credit score of the borrower has been negatively impacted, making new financing difficult to obtain
- The home must be owner occupied and not an investment property or second home
- A modification has not been previously made on the loan

Your request for a modification was reviewed but we have determined that there are no loan modification options available for you at this time. IndyMac Mortgage Services can consider modifications to loan terms only when all of the conditions listed above are met. Based on the information you submitted in your financial package and the current status of your loan

50

payments, not all of the above conditions have been met. As a result, we cannot accommodate your request for modification.

190.    On August 25, 2010, Little received a copy of a Motion to Reschedule the foreclosure sale of her home.  The foreclosure sale was reset for September 29, 2010.

191.    By letter dated November 10, 2010, OneWest once again informed Little that it was unable to offer her a HAMP modification.  This time OneWest's reason for denial was that Little did not provide certain requested documents as part of her application. That of course made no sense, since Little had previously made all of her trial payments on a timely basis and complied with all other obligations under the TPP.

192.    On January 6, 2011, Little received a letter from OneWest regarding a HAFA Short-Sale Program.

193.    In breach of the TPP, Little never received any type of written notice explaining why she did not qualify for a permanent loan modification. Although Little demanded an explanation for the denial, none of OneWest's representatives have ever been able to provide her with an adequate explanation.

194.    During the TPP period, and thereafter, OneWest reported Little's loan as delinquent to credit bureaus, and as a result, Little's credit score was negatively affected. OneWest breached its promise under the TPP to consider Little for a loan modification and to permanently modify her loan if she was eligible. Despite her acceptance of and performance under her contract with OneWest, compliance with HAMP requirements and her continued monthly payments under the TPP Agreement, Little never received a consistent or adequate explanation for the denial of a permanent loan modification.  Due to IndyMac's egregious conduct, Little lost her home through a foreclosure and sale.  After her home was taken away, for several months Little lived in a homeless shelter. OneWest's intentional and systematic failure to even respond to homeowners and breach

of its promise to consider HAMP modification applications and give homeowners determinations one way or the other, has undercut the entire purpose of HAMP and has caused substantial injury to Little and the class she seeks to represent.

**Plaintiff Maria Greggio**

195.    Plaintiff Maria Greggio has been the owner of 3030 N. Elbridge Avenue, Chicago, Illinois 60618 since July 1999.  On March 6, 2008, she took out a $288,000 adjustable rate mortgage loan (variable-interest only) for the purpose of refinancing her residence from IndyMac. Since 1999, the property has been Greggio's primary residence.

196.    Since 2003, Greggio's loan has been serviced by IndyMac and OneWest.

197.    In April 2008, as a result of a downturn in the economy, Greggio lost her job where she had been working for over 12 years as an accountant.  As a result of her loss of income, Greggio started encountering serious financial difficulties.  In December 2009, after becoming fearful that she would not be able to make her monthly mortgage payments anymore and in search of financial relief, Greggio contacted IndyMac to seek assistance with a loan modification. After speaking with one of IndyMac's representatives, Greggio was told that she should apply for a HAMP loan modification.  Based on those instructions and still current on her mortgage payments, on December 26, 2009, Greggio applied to IndyMac for a HAMP loan modification and provided all documents requested by IndyMac.

198.    In January 2010, Greggio stopped making her mortgage payments because she was experiencing serious financial problems and, after speaking to IndyMac's representatives, it was her understanding that it would take three months for her to get a loan modification (a modified amount that she could afford to pay).

199.    By letter dated March 12, 2010, OneWest offered Greggio a TPP under the HAMP. To accept the offer, Greggio was required to make "a new monthly payment of $1,148.82 for the next three months of the trial period." The letter stated that in order to receive a permanent modification, Greggio needed to make all the trial period payments on a monthly basis (on dates established by IndyMac) and to send IndyMac copies of certain documents including a completed Hardship Affidavit, and IRS Form 4506-T and income verification, such as a recent quarterly per year-to-date profit/loss statement, no later than March 29, 2010:

> **Congratulations!** You are approved to enter into a trial period plan under the Home Affordable Modification Program! This is the first step towards lowering your mortgage payments. Please read this letter so that you understand all the steps you need to take now to lower your mortgage payments permanently.
>
> **What do I need to do first?** To accept this offer, you must make a new monthly payment of $1,148.82 for the next three months of the trial period. This payment is due on the first day of each month. So your first payment is due 4/1/2010, your second payment is due 5/2/2010 and your third payment is due 6/1/2010. <u>Send these payments instead of your normal monthly mortgage payment</u>.
>
> **Why is there a trial period?** The trial period offers you immediate relief while we process the paperwork to determine if we can offer you a permanent loan modification. It also gives you time to make sure that you can manage the lower monthly mortgage payment. Please note that your existing loan and its requirements remain in effect and unchanged during the trial period.
>
> **How do I get a permanent modification?** If you do not make each trial period payment in the month in which it is due, your loan may not be modified under the Home Affordable Modification Program.
>
> In addition to making your trial period on time, you must send copies of all the documents that are checked below to IndyMac Mortgage Services…

(A true and accurate copy of the letter is attached hereto as Exhibit H.)

200.    On March 22, 2010, Greggio signed the TPP and mailed and faxed it along with her first trial period payment in the amount of $1,148.82 to OneWest. Greggio also mailed and faxed

OneWest all requested documentation and financial information. That same day, OneWest sent Greggio a letter explaining that it had received her application for a loan modification and that it was in the process of reviewing her financial situation to determine whether or not she was eligible for a permanent HAMP modification. In order to complete its evaluation, OneWest claimed that it was missing certain documents and explained in the letter:

> We cannot complete our review of your loan because your application is missing the following documents:
>
> - The rental agreement you submitted was for an expired lease period. To continue evaluation of your loan you will need to submit a current rental agreement.
>
> - We did not receive copies of your most recent two (2) months' bank statements. Please submit these documents as soon as possible.
>
> - We did not receive a Request for Modification and Affidavit. Please submit this completed and signed document so that we can continue to review your loan for a modification
>
> ***
>
> When we receive all of the required documents, we will complete your review of your loan to determine if you are eligible for a permanent loan modification. You will be notified of the results immediately.

201. Despite the fact that Greggio had already mailed and faxed OneWest copies of her bank statements and affidavit, Greggio resent that information to OneWest along with a current rental agreement.

202. On April 5, 2010, Constance Favors, one of OneWest's Customer Loan Counselors, sent Greggio a letter explaining that OneWest had received her signed modification agreement and that she would be contacted within 14 days about the next steps in the loan modification process. The letter stated:

Dear Valued Customer:

Please accept this letter as written confirmation that IndyMac Mortgage Services, a division of OneWest Bank, FSB has received your signed modification agreement.

This is a significant step in completing the modification process and keeping you in your home. ***Over the next three months***, there will be other important milestones that must be achieved and I will be here to assist you to make sure you understand the progress and expectations to fulfill the requirements of this program.

In order to get this process started and so we can discuss the program in detail, ***I will be reaching out to you sometime over the next 14 days to conduct an introductory discussion***. We will be discussing your financial situation and making sure you understand the next steps. ***I would encourage you to wait for my call and to have your monthly expenses and income information available for discussion.***

In order to accommodate this process and to allow you the flexibility needed to speak freely, most of our communication will take place during weekend and evening hours via outbound calls to your residence.

***It is important that we can collectively manage through this process by forging a partnership, staying in contact with one another and having frank discussions***. I look forward to assisting you through this process and I am committed to making this experience as smooth as possible.

This company is a debt collector and any information obtained will be used for that purpose. However, if you have filed a bankruptcy petition and there is either an "automatic stay" in effect in your bankruptcy case, or your debt has been discharged pursuant to the bankruptcy laws of the United States, this communication is intended solely for informational purposes.

Sincerely, Constance Favors Loan Counselor LMOl4 003 19W

(Emphasis added).

203.    Contrary to the representations made by OneWest in the April 5 letter, neither Ms. Favors nor any other OneWest representative contacted Greggio during the next 14 days to have a discussion about her application for a loan modification.

204.  On April 9, 2010, OneWest's Brandon Lattman sent Greggio a letter explaining that OneWest was in the process of reviewing her financial situation to determine whether or not she was eligible for a permanent HAMP modification but was missing certain documents to complete its review. The letter stated in part:

> Unfortunately, we cannot complete our review because the information you submitted is incomplete for the following reasons:
>
> •  The benefits documentation that you recently submitted only included the application for benefits.  Please submit a copy of the benefits award letter, including the timeframe in which the benefits would be paid and the amount of each payment.
>
> ***
>
> Once we have received all of the required documents, we will complete our review of your situation and contact you regarding your eligibility for HAMP.

205.  After speaking to a OneWest representative, on or about April 20, 2010, Greggio faxed OneWest a copy of the benefits award letter, including the timeframe in which the benefits would be paid and the amount of each payment.  After sending the fax, Greggio called OneWest and was informed by a representative that the fax was received.

206.  On April 23, 2010, Greggio continued to fulfill her obligations under the TPP and sent OneWest her second trial period payment in the amount of $1,148.82.

207.  On May 24, 2010, Greggio continued to fulfill her obligations under the TPP and sent OneWest her third trial period payment in the amount of $1,148.82.

208.  In May 2010, Greggio decided to spend time in Michigan to take care of her two young grandchildren and daughter-in-law who had been diagnosed with cancer and was undergoing chemotherapy.  So that she could receive all of her OneWest mail in a timely fashion, Greggio sent a letter to OneWest requesting that it change her mailing address on her mortgage

loan. That request was confirmed on May 26, 2010, when OneWest changed its records to reflect Greggio's temporary address in Michigan and confirmed that all correspondence going forward would be sent to that address.

209. Pursuant to the terms of the TPP, Greggio expected that if she complied with all requirements of the TPP, she was entitled to be informed by OneWest about her eligibility for a permanent HAMP modification by no later than June 1, 2009.

210. On June 23, 2010, Greggio continued to fulfill her obligations under the TPP and sent OneWest her fourth trial period payment in the amount of $1,148.82, for the month of July.

211. After not hearing back from OneWest, in June 2010, Greggio sent a letter to OneWest to make it aware that her income situation had changed. Greggio informed OneWest that shortly after applying in December 2009 for her HAMP loan modification she started renting out part of her house to gain additional income. The letter also explained that Greggio had never been in default on her mortgage until she applied for a HAMP loan modification. Finally, Greggio asked OneWest if it needed any additional information to make its decision about her eligibility for a permanent HAMP loan modification.

212. By July 2010, Greggio had still not yet heard back from OneWest regarding her June 2010 letter or whether or not she was eligible for a permanent HAMP modification. When she contacted OneWest, she was told by different representatives to continue making her trial payments and that her application was still under review.

213. On July 23, 2010, Greggio continued to fulfill her obligations under the TPP and sent OneWest her fifth trial period payment in the amount of $1,148.82.

214. On August 24, 2010, Greggio continued to fulfill her obligations under the TPP and sent OneWest her sixth trial period payment in the amount of $1,148.82.

215.    On August 17, 2010, OneWest's Brandon Lattman sent Greggio a letter explaining that OneWest had received all of her documents but had rejected her bank statements because they did not "clearly list deposits for the benefits you receive."  The letter asked that Greggio "submit bank statements that clearly list the deposits as benefit deposits" and such submission needed to be made by no later than August 31, 2010 if she wanted to continue to be considered for a HAMP modification.

216.    In response to OneWest's August 17 letter, once again Greggio sent OneWest copies of her three most recent monthly bank statements.  She also included a print out of bank deposits from her checking account indicating her rental and pension benefit income for the last three months with a detailed letter explaining the deposits.

217.    On September 24, 2010, Greggio continued to fulfill her obligations under the TPP and sent OneWest her seventh trial period payment in the amount of $1,148.82.

218.    On September 8, 2010, OneWest sent a letter to Greggio informing her that it was unable to offer her a permanent HAMP modification because she did not provide them with requested documents.  The letter stated in part:

> Dear Maria E Greggio,
>
> You recently entered into a Home Affordable Modification Program (HAMP) trial plan agreement with IndyMac Mortgage Services. By participating in HAMP, IndyMac Mortgage Services has agreed to follow the rules and guidelines that have been established by the United States Department of the Treasury. While this program is designed to help borrowers who are experiencing a financial hardship, not all borrowers will meet the eligibility requirements established by the Department of the Treasury, and therefore, not all borrowers are eligible for a HAMP loan modification.
>
> **We are unable to offer you a Home Affordable Modification because you did not provide us with the documents requested. A notice which listed the specific documents we needed and the time frame required to provide them was sent to you more than 30 days ago.**

219.     Greggio was shocked to receive OneWest's September 8 letter denying her request for a permanent HAMP modification because she had complied with all of OneWest's requests and made all of her trial period payments on a timely basis.  Immediately after receiving the letter, Greggio contacted OneWest.  During a call with one of OneWest's representatives, Greggio disputed her denial and explained that she had submitted all documents on a timely basis.  After reviewing OneWest's records, the representative told Greggio that OneWest in fact had all of the required information and would forward it to her team for review.

220.     On October 25, 2010, Greggio continued to fulfill her obligations under the TPP and sent OneWest her eighth trial period payment in the amount of $1,148.82.

221.     On October 18, 2010, OneWest sent a letter to Greggio which essentially admitted that its September 8 denial letter had been a mistake because it had all of her "missing" documents and that it would proceed with its review process expeditiously.  The letter stated in part:

> Dear Maria E Greggio:
>
> This letter acknowledges IndyMac Mortgage Services' receipt of your dispute regarding missing documentation needed to determine eligibility for a Home Affordable Modification Program loan modification.
>
> After reviewing your account, we have confirmed that the requested documents have indeed been received. Therefore, the review process for a permanent modification will now move forward. ***We apologize for our error and will expedite the modification review accordingly***. Please expect a written decision on your loan modification within 15 business days.

222.     On November 23, 2010, Greggio continued to fulfill her obligations under the TPP and sent OneWest her ninth trial period payment in the amount of $1,148.82.

223.     Greggio did not receive a response from OneWest within 15 business days as promised in OneWest's October 18th letter.

224.    Eleven months after her 2009 initial loan modification application, on November 10, 2010, OneWest sent a letter to Greggio denying her request for a permanent HAMP loan modification because OneWest claimed she failed HAMP's NPV test:

> Dear Maria E. Greggio,
>
> Thank you for your recent request to modify the terms of your mortgage serviced by IndyMac Services, a division of OneWest Bank, FSB.
>
> On March 4, 2009, the United States Department of the Treasury launched the Home Affordable Modification Program (HAMP). The program was adopted by IndyMac Mortgage Services on August 11, 2009. By signing up for HAMP, IndyMac Mortgage Services has agreed to follow the rules and guidelines that have been established by the Department of the Treasury. While the program is designed to help borrowers who are experiencing a financial hardship, not all borrowers will meet the eligibility qualifications established by the Department of the Treasury, and therefore, not all borrowers are eligible for a HAMP loan modification.
>
> The Home Affordable Modification Program requires a calculation of the net present value (NPV) of a modification using a formula developed by the Department of the Treasury. The NPV calculation requires us to input certain financial information about your income and your loan including the factors listed below. When combined with other data in the Treasury model, these inputs estimate the cash flow the investor (owner) of your loan is likely to receive if the loan is modified and the investor's cash flow if the loan is not modified.
>
> Based on the NPV results the owner of your loan has not approved a modification.
>
> NPV Inputs
> * Unpaid balance on the original Loan as of 11/5/2010: $288,000.00
> * Interest rate before modification as of 11/5/2010: 4.875%
> * Months delinquent as of 11/5/2010: 2
> * Principal and interest payment before modification: $1,170.00
> * Monthly insurance payment: $147.58
> * Monthly real estate taxes: $0.00
> * Monthly HOA fees (if applicable): $0.00
> * Monthly gross income: $1,702.03
> * Borrower's total monthly obligations: $1,493.12
> * Zip Code: 60618
> * State: IL
>
> In addition to the above inputs, your FICO Score and ARM reset date and rate, if applicable, were used in the NPV calculation. If we receive a request from you within 30 calendar days from the date of this letter, we will provide you with the values used.

If, within 30 calendar days of receiving this information you provide us with evidence that any of these input values are inaccurate, and those inaccuracies are material, for example a significant difference in your gross monthly income or an inaccurate zip code, we will conduct a new NPV evaluation. While there is no guarantee that a new NPV evaluation will result in the owner of your loan approving a modification, we want to ensure that the NPV evaluation is based on accurate information.

225. On November 18, 2010, Greggio sent a timely letter to OneWest disputing its decision not to provide her with a permanent HAMP modification. In that letter, Greggio explained that OneWest had used the wrong gross income number ($1,702.03) in its NPV calculation and should have used her true gross income of $2,893.03. After sending the dispute letter, Greggio contacted OneWest to inform it that she was disputing the HAMP denial. During a call with one of OneWest's representatives, Greggio was instructed to continue to make her trial payments until a final decision was reached regarding her dispute.

226. On December 24, 2010, Greggio continued to fulfill her obligations under the TPP and sent OneWest her tenth trial period payment in the amount of $1,148.82.

227. Throughout December 2010 and January 2011, Greggio tried to get updates regarding her application but could not get any information from OneWest regarding the status of her eligibility for a permanent loan modification. Extremely frustrated by OneWest's conduct, in January 2011, Greggio stopped making trial payments because she had not heard back from OneWest with a decision regarding her eligibility for a permanent HAMP modification.

228. On January 12, 2011, OneWest sent Greggio a Grace Period Notice and letter explaining that her loan was in serious default because she had not made her required mortgage payments. The letter incorrectly stated that her "Next Payment Due Date" was 7/02/2010. The total amount required to cure her default was $14,082.90.

229. Despite the November 18 dispute letter sent to OneWest, on February 18, 2011, the Law Offices of Codilis & Associates, P.C. ("Codilis") sent Greggio a letter entitled "Notice

Pursuant to Fair Debt Collection Practices Act." The letter explained that Greggio's account had been referred to Codilis for the institution of foreclosure proceedings.

230. In February 2011, OneWest sent Greggio a letter denying her for a permanent HAMP loan modification. Unlike the November 10, 2010 letter where OneWest denied Greggio for a modification because she failed the NPV test, this time OneWest denied the request because it claimed that her home was no longer her primary residence.

231. On February 9, 2011, Greggio sent OneWest a letter disputing the denial because she was still living in Chicago as it had been her primary residence for over 24 years. In the letter, she explained that spending time in Michigan to take care of her sick daughter-in-law clearly was not a change in her primary residence. The only reason that Greggio asked OneWest to change her mailing address was so that she would promptly receive all important documents regarding her request for a permanent HAMP modification. Greggio attached several documents to the letter with evidence that 3030 N. Elbridge was still her primary residence.

232. Notwithstanding her pending dispute, on March 3, 2011, OneWest commenced foreclosure proceedings against Greggio in the Circuit Court of Cook County, Illinois County Department – Chancery Division.

233. On March 29, 2011, Codilis sent Greggio a letter explaining that it represented OneWest in the foreclosure action and that OneWest "would like to discuss your situation with you and determine what alternatives may be available to avoid a foreclosure sale." Codilis suggested that OneWest might be able to provide foreclosure alternatives such as a repayment plan, loan modification, short sale and deed in lieu of foreclosure. The letter asked Greggio to complete a borrower's financial statement in order to assist with alternatives to foreclosure.

234.     Greggio became extremely frustrated and scared because she did not understand why OneWest was trying to take away her home when she was willing to work out a solution and pay off the full terms of her loan.   On March 30, 2011, Greggio filed a complaint with the Comptroller of the Currency which was later referred to the Office of Thrift Supervision on April 8, 2011.

235.     On April 5, 2011, Greggio filed an answer (pro se) to OneWest's foreclosure complaint.

236.     On April 6, 2011, despite the fact that OneWest already had all of her financial information, Greggio sent a letter to Codilis which included her "Borrower's financial statement." In the letter, Greggio explained her history with OneWest and that she was willing and able to make her mortgage loan payments if she received a permanent HAMP modification.

237.     On April 13, 2011, the OTS sent a letter to Greggio explaining that it was in receipt of her complaint against OneWest and that it had forwarded it to OneWest for a response.

238.     On April 21, 2011, OneWest sent Greggio a letter in response to her complaint with the OTS.   The letter essentially repeated the information contained in OneWest's November 10, 2010 letter.   However, once again, the letter failed to address why OneWest had used $1,702.03 as an input for Greggio's NPV analysis when in fact her monthly net income was $2,893.03. The letter also suggested that Greggio could re-apply for a modification by re-submitting a complete modification package.   The letter did not mention that it had denied Greggio's request for a permanent HAMP modification because her home was no longer her primary residence.

239.     Because Greggio did not have any other alternatives, once again, at the end of April 2011, Greggio provided OneWest with her application for a HAMP loan modification and financial documents.

240.    On May 4, 2011, Greggio appeared pro se in Court during a status conference regarding her foreclosure proceedings.  During that conference, OneWest represented to the Court that Greggio was not living in her property.  Greggio told the Court and OneWest that her home was indeed her primary residence and that she desperately wanted to keep her home and would work with OneWest regarding their dispute concerning her income.

241.    On June 28, 2011, OneWest sent Greggio a letter explaining that it had received her application for a loan modification under the HAMP:

> Dear Maria E Greggio,
>
> We have received your application for a loan modification under the Home Affordable Modification Program (HAMP). Currently, we are reviewing your application and financial situation for eligibility. The process includes review of all documents and verification that you are requesting modification on an owner-occupied home.
>
> **HAMP Requirements**
> As a part of our review process we will make sure that your loan meets the following requirements:
>
> • Mortgage is a first lien mortgage loan originated on or before January 1, 2009.
> • Loan has not been previously modified under HAMP.
> • Home is an owner-occupied primary residence.
> • Mortgage is secured by a one-to four-unit property, one unit of which is your primary residence.
> • Property is not vacant or condemned.
> • Current mortgage payment is more than 31% of your gross monthly income.
> • You are able to provide evidence of financial hardship.
> • You are able to provide documentation of your income.
> • All required steps included in our financial packet have been completed.
> • All required information requested in the financial packet has been submitted.
>
> The above list is only a summary of the HAMP guidelines. Other requirements which are not listed may affect the eligibility of your loan.
>
> **Please submit all required documentation**. Attached to this letter is an income Worksheet to help you check which financial documents we will

need to complete our review of your application. This is important, if you do not submit all documents you may have to re-apply and start the application process again.

If you have already submitted these documents you do not need to send in any additional information at this time.

*** 

***Our current review period will take approximately 30 days***. If we determine that we need additional information from you during this review period you will receive additional letters requesting specific documentation. Please respond to those letters as quickly as possible so that we may continue our review.

Once your application is complete if it is determined that you qualify for HAMP, you will then enter into a HAMP Trial Plan, which will lower your monthly payments for three months. Approval for a final HAMP modification will be determined by your current financial situation and the successful completion of the Trial Plan.

*** 

**Borrowers Previously Denied for HAMP**
For borrowers previously evaluated for HAMP who did not successfully complete the HAMP Trial Period Plan or who were determined to be ineligible for HAMP, IndyMac Mortgage Services will consider an additional request for a HAMP only if the below conditions are met:

- A significant change in the borrower or co-borrower's health has occurred, such as a serious illness or death, or
- More than a 20% increase has occurred between the verified income previously used to evaluate HAMP eligibility and the current income provided.
- The borrower has not increased other debt obligations since the previous evaluation.

242.    On June 28, 2011, OneWest sent a different letter to Greggio indicating that it had received and accepted her application but that some of her documents were missing and certain information needed to be updated.  The letter explained that:

In order to continue processing your modification request we will need to verify your income. Please submit the following documents: A) Most recent pay stubs. If paid weekly, provide copies of your four (4) most recent paystubs. If paid every other week or twice per month, provide copies of

65

your two (2) most recent paystubs. The paystubs must reflect an entire month of pay and all submitted pay stubs must reflect at least part of your Social Security number (e.g. last four digits) or another type of identification number (e.g. employee ID, payroll number, etc.). B) Most recent filed federal tax return (signed with all pages and schedules), and a Signed 4506-T. C) If you are self employed, please submit your most recent quarterly or year-to-date profit and loss statement (must be at least three (3) consecutive months). D) If you receive income that cannot be validated by any of these documents, please call 1.877.606.4270 to speak with one of our loan counselors.

In response to the June 28 letter and request for documents, Greggio immediately mailed and faxed all documents to OneWest.

243.     On July 14, 2011, OneWest sent Greggio a letter and asked her to once again resubmit her proof of income.

244.     On August 10, 2011, despite the fact that Greggio had resubmitted her application and financial information to OneWest numerous times, Adam Bourne from OneWest sent Greggio a letter offering to assist her with a workout plan such as a loan modification or foreclosure alternative program.

245.     On August 25, 2011, Lesley Gonzalez, a OneWest Loss Mitigation Specialist, sent Greggio a letter regarding her application for a loan modification:

Dear Maria E Greggio:

I have tried to contact you with the numbers provided in our system and have yet to get a response back from you. I was trying to get in contact with you because there are still some items that are required before I can process your Loan Modification or Short Sale Request. Please call me as soon as possible to inform me of the status.

We have not received the following required items, which were due on or before 08/25/2011 in order to process your updated proof of income:

* award letter for disability and 3 months of bank statements
* if rental lease and 3 months of bank statements or schedule E

66

> If these are not returned by 09/06/2011 the approved terms will become null and void and we will have to close our file. If you have any questions or concerns, please contact us at the below referenced number. Otherwise, thank you in advance for your cooperation.

246.    Consistent with OneWest's practices, notwithstanding the above referenced letter and the fact that it appeared that OneWest was still reviewing her application for a HAMP modification, that same day, on August 25, 2011, OneWest sent yet another letter to Greggio denying her a permanent HAMP modification:

> Dear Maria E Greggio:
>
> Thank you for your recent request to modify the terms of your mortgage which is serviced by IndyMac Mortgage Services, a division of OneWest Bank®, FSB.
>
> While the Making Home Affordable Program (HAMP) is designed to help borrowers who are experiencing financial hardship, not all borrowers will be eligible to participate. Each case is evaluated based on each program's specific qualification criteria. As we previously advised in our letter of 08/04/2011, your circumstances were reviewed and analyzed and, unfortunately, it was determined you do not qualify for HAMP.
>
> We know this is a challenging time for you, financially, and IndyMac Mortgage Services would like to help. We have alternative programs which are designed to benefit borrowers who may not have the ability to make required mortgage payments that you may qualify for.
>
> I will be contacting you within the next 14 days so that we can initiate this qualification review. In preparation for this call, please have your monthly expenses and income information readily available, as we will be discussing your financial situation to determine your eligibility for other home retention programs.
>
> We look forward to assisting you as we work through this review and are committed to making this experience as uncomplicated as possible.

247.    On December 7, 2011, Greggio received a letter from Gabriela Rangel, a member of OneWest's Customer Contact Team. The letter explained that Ms. Rangel had been assigned to Greggio as her new customer contact manager, replacing her previous customer contact manager.

The letter explained that "No action is needed from you at this time. My team is reviewing your current situation and evaluating possible workout options to help you avoid foreclosure." That same day, OneWest also sent a different letter to Greggio explaining that it was in the process of reviewing her loan for eligibility for a modification but needed additional documents. Not surprisingly, the letter explained that OneWest was missing bank statements, a financial letter and documents showing benefit income. Despite her frustration, Greggio once again complied and sent OneWest the requested documents and information.

248.    In January 2012, Greggio contacted Nobel Neighbors to assist her in her dealings with OneWest. Nobel Neighbors is a U.S. Department of Housing and Urban Development ("HUD") certified, not for profit counseling agency that serves the Chicago area.

249.    On January 12, 2012, Nobel Neighbors sent the Circuit Court a letter explaining that it was assisting Greggio and that she had been improperly denied a loan modification by OneWest. Nobel Neighbors also explained to the Court that it was in the process of helping Greggio work with OneWest to reapply for a loan modification.

250.    On January 13, 2012, OneWest sent a letter to Greggio explaining that it was in the process of reviewing her loan for eligibility for a modification but needed additional documents. Despite the fact that Greggio had sent these documents to OneWest on numerous occasions, the letter stated once again that OneWest was still missing bank statements, a financial letter and documents showing benefit income. This letter also stated that OneWest was missing Greggio's Request for Mortgage Assistance.

251.    On January 26, 2012, Greggio attended the Illinois Cook Country Mortgage Foreclosure Mediation orientation workshop to try to get ideas on how to get a loan modification from OneWest.

252.    On January 30, 2012, Nobel Neighbors on behalf of Greggio submitted a new request for mortgage assistance with all supporting financial information.

253.    On February 3, 2012, OneWest sent another letter to Greggio explaining that it was in the process of reviewing her loan for eligibility for a modification but needed additional documents.  The letter explained that OneWest was still missing a bank and financial letter and a Borrower Response Package.

254.    On February 21, 2012, Nobel Neighbors on behalf of Greggio submitted a new Borrower Response Package which included an updated financial letter.

255.    On February 27, 2012, OneWest sent Greggio another letter explaining that it was reviewing her loan modification application and financial situation.

256.    On March 14, 2012, Greggio started working with Chicago Volunteer Legal Services to assist her with mediation and foreclosure proceedings with OneWest.

257.    On March 19, 2012, OneWest sent Greggio another letter explaining that she had been denied a permanent HAMP modification and that it was willing to work with her to pursue a short sale:

> Dear Maria E. Greggio,
>
> Thank you for contacting us about your mortgage.  Based on a careful review of the information you provide we will work with you to pursue a short-sale. This foreclosure alternative offer is sent to you due to the fact that your loan did not qualify for the Home Affordable Modification Program and you did not qualify for any other home retention options.

258.    On May 10, 2012, OneWest sent Greggio a letter explaining that her mortgage payment was past due and her loan was in default. OneWest explained to Greggio that she had options and asked her to once again complete and submit a Borrower Response Package (which included a Uniform Borrower Assistance Form, IRS Form 4506T-EZ, income documentation, and

hardship documentation). OneWest instructed that Greggio needed to submit the Borrower Response Package by no later than June 9, 2012.

259. By March 2012, Greggio had started receiving Social Security in the amount of $742.00 per month. As a result, Nobel Neighbors on behalf of Greggio informed OneWest about her new income and asked whether such change would help her get a loan modification. OneWest instructed Nobel that Greggio should reapply once again for a loan modification.

260. On June 14, 2012, Greggio sent a letter to OneWest expressing her sincere desire to keep her home and fulfill her loan obligations.

261. On June 15, 2011, Codillis confirmed to a case manager from the Circuit Court of Cook County that it had received the documents sent from Nobel Neighbors on behalf of Greggio. But ten days later on June 25, 2012, Codillis asked Greggio to complete another new form which appeared to be a request for a non-HAMP loan modification.

262. On July 31, 2012, Greggio received a letter from Maria Rangel, a member of OneWest's Customer Contact Team. The letter explained that Ms. Rangel had been assigned to Greggio as her new customer contact manager, replacing her previous customer contact manager (Gabriella Rangel). The letter explained that "No action is needed from you at this time. My team is reviewing your current situation and evaluating possible workout options to help you avoid foreclosure."

263. On or about August 16, 2012, OneWest sent Greggio a letter informing her that she did not qualify for a HAMP modification or any other home retention options.

264. On August 27, 2012, Greggio's counsel sent a formal dispute letter to OneWest in response to its letter dated August 16, 2012.

265.    On September 13, 2012, after almost two agonizing years of trying to get a loan modification, Greggio received a letter from OneWest explaining its version of why she had been denied a permanent HAMP loan modification.   In the letter, OneWest admitted that Greggio's home was her primary residence:

> Dear Ms. Greggio,
>
> I am writing in response to a letter (enclosed) dated August 27, 2012, sent on your behalf from Mr. Bruce Montgomery to Ms. Kelly Parker, Loss Mitigation Specialist with OneWest Bank. I appreciate the opportunity to address your concerns regarding the denial of your request for a loan modification.
>
> We are not sending a response to Mr. Montgomery due to the lack of an email or mailing address provided from him. We request that you forward a copy of this response to him for his records. Mr. Montgomery's letter is a dispute of your recent loan modification denial and he believes that you qualify for a modification.
>
> On August 16, 2012, we determined that we were unable to approve you for the Home Affordable Modification Program (HAMP) or an investor (Fannie Mae) sponsored modification because based on your verified income, the proposed modified payment was not affordable.
>
> The monthly verified gross income was calculated to be $2,494.51 by using a total of $587.95 from your pension income, $927.50 from your Social Security income, and $979.06 from your rental income, as opposed to the amount Mr. Montgomery indicated in his letter which is $3,429.00. Please note that the rental income was calculated from your 2011 tax returns per underwriting guidelines. ***According to the most recent modification review we were able to verify your occupancy status as owner occupied***.
>
> We utilized the HAMP model of lowering the interest rate to 2% and extending the term to 40 years as mentioned in the referenced letter. We were unable to result in an affordable payment (principal, interest, and escrow) under the HAMP that was equal to 31% of the calculated income of $2,494.51.
>
> We may only offer a home retention option via a maximum six (6) month repayment plan or receipt of a full reinstatement of the loan. If you wish to pursue either of these options, please contact the Customer Service Department at 1.800.781.7399. Also mentioned in our August 16, 2012, letter was an option for you to apply for a short sale under the Home

Affordable Foreclosure Alternatives (HAFA) program. If you wish to pursue this option, please follow the instructions in the letter to apply.

266.    After reviewing the letter, Greggio realized that once again OneWest's HAMP denial was in error.  This time, as part of NPV analysis, OneWest only had considered $979.06 in rental income when in fact she collected $2,100.00 on a monthly basis.  As part of its analysis, OneWest also failed to consider Greggio's bank deposits.

267.    On October 16, 2012, Greggio sent OneWest a "qualified written request" under Section 6 of the Real Estate Settlement Procedures Act for its improper denial of Greggio's request for a permanent HAMP modification.  Greggio also requested that OneWest provide all of the information that it retained in its file regarding her loan and copies of the calculations underlying the determination that she was ineligible for a permanent HAMP modification.

268.    On November 6, 2012, OneWest responded to Greggio's October 16 letter and declined to provide her any material supporting its determination that she was ineligible for a permanent HAMP loan modification.  The letter stated in relevant part, "To the extent we are obligated either contractually or under any applicable statute or regulation to furnish the requested information to you, such information had been provided.  We respectfully decline to provide any other information you may have requested, as such information may be privileged, confidential or otherwise not subject to disclosure."

269.    On November 15, 2012, OneWest filed a Motion for Summary Judgment and Judgment of Foreclosure and Sale against Greggio.

270.    During the TPP period, and thereafter, OneWest reported Greggio's loan as delinquent to credit bureaus, and as a result, Greggio's credit score was negatively affected.  OneWest breached its promise under the TPP to consider Greggio for a loan modification and to permanently modify her loan if she was eligible. Despite her acceptance of and performance under

her contract with OneWest, compliance with HAMP requirements and her continued monthly payments under the TPP Agreement, Greggio never received a permanent loan modification. OneWest's intentional and systematic failure to even respond to homeowners and breach of its promise to consider HAMP modification applications and give homeowners determinations one way or the other, has undercut the entire purpose of HAMP and has caused substantial injury to Greggio and the class she seeks to represent.

271.　Still desperate to save her home, on January 10, 2013, Greggio sent OneWest all of her paperwork and reapplied for a HAMP loan modification.

**Plaintiff Raymond Barbosa**

272.　Plaintiff Raymond Barbosa is the owner of a home located at 1227 N Kenilworth Ave, Oak Park, Illinois 60302.

273.　On March 3, 2008, Barbosa refinanced his $417,000 mortgage loan with IndyMac. Barbosa's loan has been serviced by IndyMac or OneWest at all relevant times.

274.　On or about May 2008, Barbosa's ex-wife became seriously ill.　Barbosa's son was in college and Barbosa made the decision to take a leave of absence from work so that he could take care of Ms. Barbosa and help her with her medical issues.　For approximately four months, Ms. Barbosa was hospitalized.　Taking time off from work caused Barbosa's income to drop.

275.　By July 2008, Barbosa was encountering serious financial difficulties and started to default on his loan payments.　In search of financial relief, Barbosa contacted IndyMac at the end of 2008 to seek assistance with a loan modification.　After numerous conversations with IndyMac between December 2008 and February 2009, Barbosa was told that IndyMac was willing to work with him on a loan modification.

276.     Despite IndyMac's agreement to work with Barbosa on a loan modification, on March 4, 2009, IndyMac commenced a foreclosure action against Barbosa in the Illinois Circuit Court of Cook County.

277.     On or about March 17, 2009, Barbosa entered into a trial modification payment plan with IndyMac.  Barbosa was required to make a new monthly payment of $3,431.88 for the three months of the trial period (by no later than March 27, 2009, April 27, 2009 and May 27, 2009).  During the three month trial period, Barbosa was told by IndyMac that he would be evaluated for a permanent modification and that any foreclosure action would be suspended during the trial period.

278.     After being informed that his personal check was not adequate, on March 18, 2009, Barbosa sent a cashier's check in the amount of $3,431.88 to IndyMac for his first payment under the trial loan modification plan.

279.     On April 1, 2009, Barbosa's attorney, Alex Ogoke, sent Ira Nevel (IndyMac's foreclosure attorney) a letter informing him that the foreclosure process should be suspended while Barbosa was making his trial payments and evaluated for a permanent loan modification.

280.     On April 10, 2009, Barbosa sent a cashier's check in the amount of $3,431.88 to IndyMac for his second payment under the trial loan modification plan.

281.     On April 14, 2009, Barbosa received a letter from IndyMac informing him that, effective March 19, 2009, the servicing of his mortgage, had been assigned, sold or transferred from IndyMac Federal Bank, FSB to IndyMac Mortgage Services, a division of OneWest Bank, FSB.

282.    On May 1, 2009, Barbosa made his third and final payment of $3,431.88 under the trial loan modification plan.  That day, Barbosa's attorney Alex Ogoke sent a letter to IndyMac asking for executed copies of all permanent loan modification documents.

283.    Despite being told by IndyMac representatives that he would receive his permanent loan modification shortly, by June 2009, Barbosa did not receive his permanent modification paperwork. On June 8, 2009 Barbosa's attorney sent a follow-up letter asking for permanent loan modification documents.

284.    On June 15, 2009, Barbosa's attorney Alex Ogoke contacted IndyMac's loan modification department and was told that Barbosa would receive the permanent loan modification documents within the next week.

285.    On June 29, 2009, Barbosa's attorney Alex Ogoke sent IndyMac a cashier's check in the amount of $3,431.88 for Barbosa's fourth payment under the trial loan modification plan. Mr. Ogoke once again asked IndyMac for copies of the permanent loan modification paperwork and notification that the foreclosure action would be dismissed.

286.    At or about the end of June 2009, Barbosa's attorney Alex Ogoke was informed during a telephone call with IndyMac's loan modification department that Barbosa's loan would not be permanently modified because there was a new investor who did not want to abide by IndyMac's earlier agreement to modify his loan and that he now had to apply under a new loan modification program.

287.    On June 30, 2009, Barbosa sent IndyMac a "qualified written request" under Section 6 of the Real Estate Settlement Procedures Act for IndyMac's failure to comply with the loan payment agreement entered into on March 17, 2009.

288.     On July 1, 2009, Barbosa filed a complaint against IndyMac with the FDIC Consumer Response Center.

289.     On July 3, 2009, Barbosa filed a complaint with the Office of RESPA and Interstate Land Sales.

290.     On July 11, 2009, OneWest sent a letter to Barbosa's attorney which included a "Help Package."  The Help Package provided instructions requiring Barbosa to assemble and submit certain documents to OneWest in order for it to begin its review process for a "workout solution."

291.     On July 13, 2009, Barbosa received a letter from The Office of Thrift Supervision indicating that it had received his complaint about OneWest.

292.     On July 15, 2009, OneWest's Customer Advocate Dan Mandick sent Barbosa a letter indicating that OneWest was unable to grant him a loan modification.  The letter explained in part:

> IndyMac Mortgage Services, a division of OneWest Bank, FSB was unable to grant a loan modification on your account.  The Modification Agreement states that it is not a binding agreement.  The modification agreement was conditioned on, among other terms, you qualifying for a modification, according to investor's guidelines.  Here, it was determined you did not qualify for a modification.  For that reason, IndyMac did not sign and forward the agreement to you.
>
> Please note that your case may be re-evaluated.  To enable us to re-evaluate your case, please fill out the attached documents and fax them back to me at (866) 451-9567.  Please make sure you fax to my attention.  I will submit them to the Loan Modification Department.

293.     On July 20, 2009, OneWest's Customer Advocate Claudia Mann sent Barbosa another letter regarding his request for a loan modification.  This letter explained in part:

> On March 17, 2009, IndyMac approved a three month forbearance plan with payments of $3,431.83 due March 25, 2009 through May 25, 2009, while we were reviewing your loan modification request.  We informed you

at the time that the payment plan was temporary and did not constitute a guaranteed loan modification. We placed the foreclosure proceedings on hold during the forbearance period.

On June 3, 2009, we closed [your] request for a loan modification under the previous FDIC modification plans as the investor of your loan now participates in the Home Affordable Modification Program (HAMP) implemented under the Obama administration. Any previous forbearance plans have been completed and we would need to receive a loan modification financial package to initiate the review of a loan modification. To apply for a loan modification request under the new HAMP we request that you visit our website at www.onewestbank.com. Please download a financial package found in the "Need Help with Payments" section and submit the completed package and required documents to the address or fax listed in the package.

294.    On July 29, 2009, OneWest sent a letter to Barbosa in response to his July 3, 2009 letter to the OTS and offered him a TPP under the HAMP. OneWest informed Barbosa that he qualified to participate in a HAMP trial plan (attached as Exhibit I hereto):

Your loan was referred to our Loss Mitigation department for review who determined, we are pleased to inform you, you have qualified to participate in the Home Affordable Modification Trial Plan. With this plan you will make trial payments of $2,398.16 for three months starting August 1, 2009. This plan has an expiration date of July 27, 2009; however we were able to secure an additional seven days for you to return the information to us. After successful completion of the trial plan, you will receive documentation regarding a potential permanent modification.

295.    To accept the TPP offer, Barbosa was required to make a new monthly payment of $2,398.16 for the three months of the trial period (August 1, 2009, September 1, 2009 and October 1, 2009) and provide certain paperwork. Barbosa was also required to send OneWest two copies of the signed TPP, a completed Hardship Affidavit, a signed and dated IRS Form 4506-T, a copy of his most recent utility bill, and documentation verifying his income. Barbosa was required to let OneWest know no later than August 3, 2009 that he accepted the TPP.

296.    The opening paragraph of the TPP contract, which is attached as Exhibit J hereto, stated the following:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section continue to be true in all material respects, then [OneWest] will provide me with a Home Affordable Modification Agreement ("Modification Agreement") as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.
>
> ***
>
> I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer *or will send me written notice that I do not qualify for the Offer*.

297.    The language in the TPP emphasized that, "TIME IS OF THE ESSENCE under this Plan" and made clear that OneWest would suspend any scheduled foreclosure sale, so long as Barbosa continued to meet his obligations under the Plan.  The TPP contract also described the "Modification Effective Date" (*i.e.*, the date when OneWest would be required to inform Barbosa whether or not he was eligible for a permanent HAMP loan modification) as "the first day of the month following the month in which the last Trial Period Payment is due."  Thus, if Barbosa complied with all requirements of the TPP, he was entitled to be informed by OneWest about his eligibility for a permanent modification by no later than November 1, 2009.

298.    On August 21, 2009, Barbosa attended a Making Home Affordable seminar in Chicago.  At the event, Barbosa talked to Kevin Kyle, one of OneWest's loan modification representatives.  Barbosa explained to Mr. Kyle that he was recently bedridden as a result of ankle surgery and had been unable to complete the paperwork required to be submitted for his HAMP trial plan.  Mr. Kyle instructed Barbosa to go ahead and forward the documents to OneWest so they could proceed with the TPP.

299.    On August 29, 2009, Barbosa sent a letter to OneWest explaining that he had talked to Mr. Kyle and wanted to accept OneWest's offer for a TPP.  Barbosa included with the letter his signed TPP, first trial payment of $2,398.16 and his Hardship Affidavit.  Barbosa informed

OneWest that he would compile the remainder of his documents and forward them to OneWest within a week.

300.    On September 2, 2009, OneWest returned Barbosa's first trial payment check of $2,398.16 because it was a personal check.

301.    On September 8, 2009, Barbosa sent OneWest a cashier's check in the amount of $2,398.16 to fulfill his first trial payment obligation.

302.    On September 29, 2009, Barbosa sent OneWest his second trial period payment of $2,398.16 (cashier's check), a signed 4506-T, a copy of his 2008 Individual Tax Return and a copy of a profit and loss statement for his three businesses.

303.    On October 8, 2009, Barbosa sent a letter to OneWest enclosing his third trial period payment of $2,398.16 (cashier's check).  In that letter, Barbosa informed OneWest that he had fulfilled his obligations under the TPP.

304.    Pursuant to the terms of the TPP, OneWest was required to respond to Barbosa by no later than November 1, 2009 regarding his eligibility for a permanent loan modification.  On October 30, 2009, Barbosa's attorney contacted OneWest to inquire as to the status of a permanent HAMP loan modification.  During that call, a representative from OneWest asked for a copy of Barbosa's most recent utility bill.  The representative also advised the attorney that Barbosa should continue to make his same trial payment for the month of November 2009.

305.    On November 4, 2009, Barbosa's lawyer sent OneWest a copy of Mr. Barbosa's utility bill.  That same day, Barbosa sent OneWest his fourth trial period payment of $2,398.16.

306.    On December 3, 2009, Barbosa's attorney contacted OneWest to find out about the status of a permanent HAMP loan modification.  During that call, the OneWest representative asked for a copy of Barbosa's 2008 tax return (which previously had been sent by Barbosa as part

of his September 29, 2009 application). Barbosa's counsel was informed that this was the final document needed to complete the file and review for a permanent modification. The representative also advised that Barbosa should continue to make his same trial payment for the month of December.

307.  On December 4, 2009, OneWest sent Barbosa an offer to dispute his debt with OneWest which now totaled $444,125.53.

308.  On December 17, 2009, OneWest sent Barbosa a letter indicating that it could not complete his HAMP review because his previously submitted profit and loss statement was not for the most recent quarter.  OneWest asked Barbosa to resubmit a statement for the most recent quarter and required that it be signed by a CPA.  The letter stated, "Once we have received all of the required information, we will complete our review of your loan to determine if you are eligible for a permanent loan modification."

309.  On December 26, 2009, Barbosa sent IndyMac his fifth trial period payment in the amount of $2,400.00.

310.  On December 28, 2009, Barbosa's attorney sent OneWest a letter addressing its request for a profit and loss statement signed by a CPA.  The letter stated in relevant part,

> Dear Mr. Latham:
>
> My client recently received the attached letter.  I am very surprised that this letter was sent out.  It has been 5 months since my client started the [HAMP] trial loan modification.  Attached are the five payments made under the modification program.  My client sent a completed package to your bank in September 2009 with the then current profit and loss statements.  Subsequent to that point we talked to various customer service personnel to find out the status of the loan modification process.  We received varying answers from "no documents were ever received" to "we needed to resend documents" (the same documents that were sent in September 2009).
>
> In November 2009, when the trial modification was to end we were told that the Bank needed additional time to review and that we should continue to send in the

trial payment because under the agreement they had an additional month factored into the documents. However, in December 2009 the same thing was requested of us and the bank requested that we continue to send in the trial payment.

The trial modification program was to be completed in 3 months time and we are now headed into the sixth month. Now you are asking for an updated packet with all requested documents. Additionally, you are also making a request that we send in profit and loss statements because the statements we submitted were not for the current quarter. Of course they were not for the current quarter because the information was submitted in September 2009 for your review. Additionally, now you are requesting that that profit and loss information be signed by a Certified Public Accountant. This is an additional cost to my client and a requirement that is not required in the trial modification package.

\*\*\*

When we have spoken to customer service representatives they have told us that they don't contact people that individuals need to contact the bank to find out what if anything was missing from the package. We had done that on numerous occasions and on numerous occasions have been told that the package was complete.

I have asked my client to start working, after the new year, on the revised profit and loss statements for the recent quarter. As soon as he completes the information, I will forward it to the bank and at that point you should have a completed package to review for a permanent loan modification. It is unfortunate that my client has to go through this process because of your failure to do a timely review of the loan modification packet that he sent in September 2009.

311.     On December 29, 2009, Barbosa sent OneWest a letter disputing the validity of the debt amount contained in OneWest's December 4 letter.

312.     On January 6, 2010, Barbosa sent OneWest his sixth trial period payment of $2,398.16.

313.     On January 6, 2010, Barbosa filed another complaint against OneWest with the Office of Thrift Supervision.

314.     On January 31, 2006, Barbosa's accountant sent OneWest a certified profit and loss statement for the quarter ending December 31, 2009.

315.     On February 3, 2010, Barbosa's attorney also sent OneWest a copy of a certified profit and loss statement for the quarter ending December 31, 2009.

316.     On February 3, 2010, Barbosa sent OneWest his seventh trial period payment of $2,398.16.

317.     On March 2, 2010, Barbosa sent OneWest his eighth trial period payment in the amount of $2,400.00.

318.     On March 5, 2010, sent another letter to the Office of Thrift Supervision regarding his complaint against OneWest.

319.     On April 8, 2010, Barbosa sent OneWest his ninth trial period payment in the amount of $2,400.00.

320.     On May 6, 2010, Barbosa sent OneWest his tenth trial period payment of $2,398.16.

321.     On June 8, 2010, Barbosa sent OneWest his eleventh trial period payment of $2,398.16.

322.      On July 1, 2010, Barbosa sent OneWest his twelfth trial period payment of $2,398.16.

323.     On August 4, 2010, Barbosa sent OneWest his thirteenth trial period payment of $2,398.16.

324.     On September 2, 2010, Barbosa sent OneWest his fourteenth trial period payment of $2,398.16.

325.     On September 24, 2010, OneWest sent Barbosa a letter informing him that he did not qualify for a loan modification under HAMP because his current housing expense was less than 31% of his monthly gross income.  After receiving the rejection letter, Barbosa and his counsel did

not understand the basis for the NPV calculation. After contacting OneWest, Barbosa could not find a representative who would explain why he was denied. Barbosa decided to continue to make his trial payments until he received an adequate explanation for his denial.

326. On October 6, 2010, Barbosa sent OneWest his fifteenth trial period payment of $2,398.16.

327. On October 6, 2010, Barbosa sent a follow-up letter to the Office of Thrift Supervision regarding his complaint against OneWest.

328. In October 2010, after speaking with a OneWest representative about the status of a permanent HAMP modification, Barbosa's attorney was asked to send OneWest another copy of the Form 4506-T Request for Transcript of Tax Return. On October 11, 2010, Barbosa's attorney complied with the request.

329. On November 10, 2010, Barbosa sent OneWest his sixteenth trial period payment of $2,398.16.

330. On November 10, 2010, OneWest resumed foreclosure proceedings against Barbosa.

331. On November 16, 2010, OneWest sent Barbosa a letter informing him that it was returning his most recent certified check because "the amount received does not represent the total amount due at this time. Please contact our office immediately for the amount required to bring your loan current."

332. On December 9, 2010, Barbosa sent OneWest his seventeenth trial period payment of $2,398.16.

333. On December 9, 2010, Barbosa sent OneWest a "qualified written request" under Section 6 of the Real Estate Settlement Procedures Act.

334.     On January 28, 2011, OneWest sent a letter to Barbosa regarding his loan modification request and explained its version of the chronology of his loan modification review. The letter explained that Barbosa did not qualify for a HAMP modification and that he was eligible for a "second look" workout program.  The letter stated in part:

- On January 29, 2010 we sent a document request letter as we had not received the document previously requested and a number of other documents had expired.  The documents requested were:  profit and loss statement of the most recent quarter, an updated singed 4506T, 2 most recent consecutive pay stubs, proof of occupancy, request for additional payments as we only received 1 trial period payment of the 3 required to that point.

- On September 24, 2010, we sent you a letter informing you your loan did not qualify for a loan modification under HAMP as your current housing expense was less than 31% of your monthly gross income.  Under HAMP, a loan may be eligible for a loan modification (subject to additional criteria) when the borrower's monthly housing payment is greater than 31% of the borrower's gross monthly income, conversely, the loan is not eligible when it is less than 31% of the borrower's gross monthly income.

335.     On February 7, 2011, Barbosa's attorney sent a letter to OneWest disputing the chronology in its January 2011 letter because between January and September 2010, OneWest never made a written request for additional financial information.   The fact that OneWest suggested that as of January 2010, it has only received one of the three trial period payments required under the TPP was absurd and is contradicted by proof that it had accepted and cashed Barbosa's trial payments for many months. In the letter, Barbosa's attorney demanded details of the NPV used to calculate whether Barbosa was qualified under the HAMP and that all foreclosure proceedings be suspended.

336.     On March 5, 2011, OneWest sent a letter to Barbosa stating that he was in default by $77,605.94 and that he needed to cure by April 5, 2011.

337.     On March 9, 2011, Barbosa's attorney sent a letter to OneWest with a copy of the December 9, 2010 RESPA letter.

338.    On March 24, 2011, OneWest sent Barbosa a letter stating that it was still willing to consider his request for a loan modification under its internal "second look" review after it received new and updated financial information.

339.    On May 16, 2011, Barbosa sent another letter to the Office of Thrift Supervision regarding his complaint against OneWest.

340.    On May 17, 2011, Barbosa's attorney sent OneWest a letter in response to OneWest's March 24 letter.

341.    On September 14, 2011, Barbosa's attorney sent OneWest a letter disputing the validity of the debt.

342.    On November 15, 2011, Barbosa's attorney received a letter from OneWest's collection attorney regarding Barbosa's dispute regarding his foreclosure.

343.    In 2012, OneWest offered Barbosa a modification under its "second look program." Barbosa refused to agree to that type of modification because he believed he was entitled to a permanent HAMP modification and that OneWest could not be trusted.

344.    In breach of the terms of the TPP, it was not until September 2010 (over a year after he had started making his trial payments) that Barbosa received a written notice explaining why he did not qualify for a permanent loan modification. Although Barbosa demanded details of the NPV calculation used to determine whether he was qualified under the HAMP, none was ever provided.

345.    During the TPP period, and thereafter, OneWest reported Barbosa's loan as delinquent to credit bureaus, and as a result, his credit score was negatively affected. OneWest breached its promise under the TPP to consider Barbosa for a loan modification and to permanently modify his loan if he was eligible.  Despite his acceptance of and performance under his contract with OneWest, compliance with HAMP requirements and his continued monthly

85

payments under the TPP, Barbosa never received a permanent loan modification. Barbosa has never been provided with an adequate explanation as to why he was denied for a permanent HAMP modification and still lives in fear that he could lose his home through foreclosure. OneWest's intentional and systematic failure to even respond to homeowners and breach of its promise to consider HAMP modification applications and give homeowners determinations one way or the other, has undercut the entire purpose of HAMP and has caused substantial injury to Barbosa and the class he seeks to represent.

**D.** **OneWest Has an Incentive Not to Modify Loans**

346. According to a *Los Angeles Business Journal* article dated June 20, 2011, OneWest has earned $2.48 billion in profit since it launched in March 2009. The article attributes OneWest's "eye-popping performance largely to unusually generous terms agreed to by the FDIC" and its ability to "profit from bad loans":

> OneWest has earned $2.48 billion in profit since it launched in March 2009, and any way you look at it, the earnings are amazing. It earned more in fourth quarter 2009 $680 million--than all other banks and thrifts headquartered in Los Angeles County combined have earned in the two years since OneWest began operating.
>
> Even in its worst quarter, last year's fourth, it recorded net income of $81 million, which accounted for more than one-third of the combined profits of the 77 banks and thrifts head quartered in the county.
>
> Last year, with a return on assets of 2.9 percent, OneWest was the second most profitable depository institution in the United States with at least $5 billion in assets, according to an analysis done for the Business Journal by Charlottesville, Va., industry research firm SNL Financial. A common banking industry metric, return on assets shows how much profit was generated as a percent of loans and other assets.
>
> "I've never seen a bank earn that kind of money and in a thrift it's even harder," Isaac said. (As a federal savings bank, OneWest falls in the thrift regulatory). "An average bank would earn 1 percent on assets; if it's a phenomenal bank, it would be earning 1.5 percent on assets."

According to SNL's data, OneWest also had a 19.4 percent return on equity, which measures the owners' rate of return. That number was the third highest in the country. Many healthy banks can brag if they earn more than a 10 percent return on equity.

The spectacular numbers stem from OneWest's unusually good deal. The bulk of its income during the first few quarters of its existence came in the category Gains and Losses on Financial Assets and Liabilities Carried at Fair Value. According to analysts, this was likely a matter of paper gains on the assets it bought from the FDIC at a discount. (The institution is not publicly traded, but all banks and thrifts must submit certain information to its regulators in quarterly call reports.)

OneWest's owners acquired IndyMac's loan portfolio at a 23 percent discount to the already depressed book value. As the market has started to rebound, many of the discounted loans have performed better than expected, allowing OneWest to recover more on the loans.

In a simplified example, a loan originally worth $100 may have been written down and further discounted, and OneWest purchased it for $60. But if the loan proved sound--which was the case for many of the loans--OneWest could sell it for, say, $80, pocketing a 33 percent profit.

But even if a loan sours, OneWest can still make money. That's because the OneWest investors entered into a loss-share agreement on more than $12 billion of IndyMac's loans and an additional $8.6 billion of FirstFed's and La Jolla's assets, meaning the FDIC will reimburse OneWest's loan losses past a certain threshold. Such agreements are not unusual, but analysts said the terms of the IndyMac deal could lead to a further windfall for OneWest.

Under the agreement, OneWest must shoulder the first 20 percent of losses on the portfolio of covered loans. The FDIC will then cover 80 percent of the next 10 percent of losses, and it will reimburse 95 percent of losses past that point--the latter a stipulation the FDIC has since stopped giving to failed-bank buyers.

The terms of the deal can actually be quite lucrative. On bad loans, OneWest, which bought many of the loans at 70 percent of par value, gets the cash from a foreclosure and is also reimbursed up to 95 percent of the difference between the original loan value and the foreclosure sale amount. Analysts said that means OneWest could actually pocket more money than it originally paid the FDIC for the loans—even though the loan was bad.

Certainly not all the bad loans will be profitable for OneWest, but in theory many could be.

It has yet to receive any payments under its IndyMac or FirstFed loss-share agreements. However, OneWest is expected to begin receiving payments soon for

legacy IndyMac assets, since it has recognized about 85 percent of the losses necessary to trigger payments, according to regulatory data.

A OneWest executive, who was not authorized to speak with the media and asked not to be named, agreed with the notion that OneWest has the FDIC to thank for the bulk of its profits.  "You got it," the executive said.

347.    OneWest has routinely failed to live up to its end of Plaintiffs' TPP Agreements.  In February 2010, the U.S. Treasury reported that IndyMac's parent company had 112,200 HAMP-eligible loans in its portfolio. Of these loans, just 3,087 were granted permanent modifications (approximately 2.75%) even though many more homeowners had made their trial payments and submitted the documentation required by the TPP Agreements.

348.    By failing to live up to its obligations under the TPP Agreements, OneWest has left Plaintiffs and other homeowners in a complete state of confusion regarding the status of their modification requests and prevented Plaintiffs and other homeowners from pursuing other avenues of resolution, including using the money they are putting towards TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.  In addition, the credit scores of homeowners have been negatively impacted as banks misreport trial payments as late payments and homeowners are encouraged to default on their loans in order to qualify for a loan modification.

349.    OneWest's intentional and systematic failure to even respond to homeowners and breach of its promise to consider HAMP modification applications and give homeowners determinations one way or the other, has undercut the entire purpose of HAMP and has caused substantial injury to Plaintiffs and the class they seek to represent.

**E.    OneWest Enters Consent Order To Address Its Deficient Practices in Residential Mortgage Loan Servicing and Foreclosure Processing**

350.    On April 13, 2010, OneWest was one of fourteen large mortgage servicers to receive an enforcement order as part of a joint effort by the Office of Thrift Supervision ("OTS"), the Office of the Comptroller of the Currency ("OCC") and the Federal Reserve System ("FRS") to "address a pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing." The Federal Reserve Board ("FRB") commented in its April 13th press release, "these deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at these institutions." The FRB also noted that it believed monetary sanctions against OneWest and other mortgage servicers were appropriate.

351.    The OneWest Consent Order (the "Consent Order") was issued by the OTS. In the Consent Order, the OTS identified certain "deficiencies and unsafe or unsound practices" in OneWest's residential mortgage servicing and foreclosure proceedings. As a result of the investigations and findings by the three federal banking regulators, OneWest agreed to implement a comprehensive action plan to address its numerous improper loan modification and foreclosure practices.  The Consent Order required OneWest to remedy its prior practices and to create a plan for ensuring effective coordination of communications with borrowers, oral and written, related to loan modification activities. The corrective action required OneWest to: (i) ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) ensure continuity in the handling of borrowers' loan files during the loan modification process by personnel knowledgeable about a specific borrower's situation; and (iii) ensure that decisions concerning loan modifications continue to be made and communicated in a

timely fashion. OneWest was also required to take corrective action relating to its loan modification practices and to create and implement a program that included, among other things:

- measures to ensure that staff handling loan modification requests routinely communicates and coordinates with staff processing the foreclosure on the borrower's property.

- appropriate deadlines for responses to borrower communications and requests for consideration of loan modifications, with the metrics established not being less responsive than the timelines in the HAMP.

- establishment of an easily accessible and reliable single point of contact for each borrower so that the borrower has access to an employee of the bank to obtain information throughout the loan modification and foreclosure processes.

- a requirement that written communications with the borrower identify such single point of contact along with one or more direct means of communication with the contact.

- measures to ensure that the single point of contact has access to current information and personnel (in-house or third-party) sufficient to timely, accurately, and adequately inform the borrower of the current status of the loan modification and foreclosure activities.

- measures to ensure that staff are trained specifically in handling loan modifications.

- procedures and controls to ensure that a final decision regarding a borrower's loan modification request (whether on a trial or permanent basis) is made and communicated to the borrower in writing, including the reason(s) why the borrower did not qualify for the trial or permanent modification (including the net present value calculations utilized by OneWest, if applicable), by the single point of contact within a reasonable time before any foreclosure sale occurs.

- policies and procedures to ensure that foreclosure, loss mitigation, and loan modification documents provided to borrowers and third-parties are appropriately maintained and tracked, that borrowers generally will not be required to resubmit the same documented information that has already been provided, and that borrowers are notified promptly of the need for additional information.

352. OneWest was also required to limit the extent to which they can pursue foreclosure during the loan-modification process. The Consent Order required OneWest to create procedures and controls to ensure that when the borrower's loan has been approved for modification on a trial or permanent basis that: (i) no foreclosure or legal action predicate to foreclosure occurs, unless the borrower is deemed in default on the terms of the trial or

permanent modification and (ii) the single point of contact remains available to the borrower and continues to be referenced on all written communications with the borrower.

353.     The enforcement action also required OneWest to hire an independent firm to conduct a comprehensive foreclosure review, overseen by the OTS, of foreclosure actions pending at any time in 2009 and 2010 to identify borrowers financially harmed by foreclosure errors, misrepresentations or other deficiencies, and to provide appropriate remediation and reimbursement. The purpose of the foreclosure review is to determine, among other things, (i) whether a foreclosure sale occurred when an application for a loan modification was under consideration when the loan was performing in accordance with a trial or permanent loan modification, and (ii) whether loan modifications were handled in accordance with the requirements of the HAMP, such that each borrower had an adequate opportunity to apply for a loss mitigation option or program, any such application was handled properly, a final decision was made on a reasonable basis, and was communicated to the borrower before the foreclosure sale.

354.     On March 19, 2012, the *Los Angeles Times* reported that OneWest would be fined by the FRB for its "unsafe and unsound practices in their loan servicing and foreclosure processing."

## CLASS ACTION ALLEGATIONS

355.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

356.     Plaintiffs bring this class action on behalf of themselves and a Nationwide Class and Illinois and Oregon Subclasses of homeowners whose loans have been serviced by Defendant and who, since July 21, 2009, have entered into a TPP Agreement with IndyMac/OneWest, made all three trial payments and otherwise complied with the terms of their TPP and suffered pecuniary

damages as a result of Defendant's failure to respond to their application for a permanent HAMP modification within a reasonable period of time. Excluded from the Nationwide Class and all state Subclasses are borrowers to whom IndyMac/OneWest provided (a) a HAMP modification or (b) a written denial of a HAMP modification within the first day of the month following the month in which their last trial period payment was due.

357. Plaintiffs sue on their own behalf and on behalf of a class of persons as described above under Rule 23(a) and (b) of the Federal Rules of Civil Procedure.

358. Plaintiffs do not know the exact number or identities of the members of the proposed Classes, since such information is in the exclusive control of Defendant. Plaintiffs believe that the Class encompasses many hundreds of individuals whose identities can be readily ascertained from Defendant's books and records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

359. Based on the size of the mortgage loans at issue, with accrued penalties, fees and interest, Plaintiffs believe the amount in controversy exceeds $5 million.

360. All members of the Nationwide Class and Illinois and Oregon Subclasses have been subject to and affected by the same conduct. The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Classes. These questions include, but are not limited to the following:

> a. Whether IndyMac/OneWest breached an express term of its TPP Agreements with Plaintiffs and other Class Members by failing to consider them for or respond to requests for permanent modifications;

b.  Whether IndyMac/OneWest breached an implied term of its TPP Agreements with Plaintiffs and other Class Members by failing to consider them for or respond to requests for permanent modification;

c.  Whether IndyMac/OneWest breached the implied covenant of good faith and fair dealing by repeatedly requesting its borrowers produce documentation already in its possession and by taking other steps to delay or prevent the extension of offers for permanent modification or the denial thereof;

d.  Whether Plaintiffs and other Class Members reasonably relied on the material representations made by Defendant relating to the offer of a permanent loan modification, and whether Plaintiffs and other Class Members suffered damage as a result of their reasonable reliance;

e.  Whether IndyMac/OneWest's conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

f.  Whether IndyMac/OneWest's conduct violates the Oregon Unlawful Trade Practices Act, O.R.S. 646.605 *et seq.*;

g.  Whether the Court can order damages, and the amount of such damages; and

h.  Whether Plaintiffs and Class and Subclass Members are entitled to injunctive relief.

361.  The claims of the individual named Plaintiffs are typical of the claims of the Nationwide Class and Subclasses and do not conflict with the interests of any other members of the Nationwide Class and Subclasses in that Plaintiffs and the other members of the Nationwide Class

and Subclasses were subject to the same conduct, applied for or requested a loan modification, complied with all requirements and were met with purposeful disorganization, ignorance and confusion on the part of IndyMac/OneWest and a failed to be informed about their eligibility for a permanent modification within a reasonable time period.

362.     The individual named Plaintiffs will fairly and adequately represent the interests of the other members of the Nationwide Class and Subclasses.  Plaintiffs are committed to the vigorous prosecution of the claims of the Nationwide Class and Subclasses and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

363.     A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

364.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and (3).

365.     Defendant has acted or refused to act on grounds that apply generally to the Nationwide Class and Subclasses so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Nationwide Class and Subclasses as a whole.

### COUNT I

### Breach of Contract
### (on behalf of the Nationwide Class)

366.     Plaintiffs repeat and re-allege the allegations in the paragraphs above as if set forth herein in full.

367.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Nationwide Class described above.

*Contract Formation: Offer and Acceptance*

368.    As described above, the TPP Agreements executed by Defendant and Plaintiffs constitute valid contracts.

369.    Defendant sent Plaintiffs a written offer inviting their acceptance by signing the documents and providing verification.  Plaintiffs accepted Defendant's written offers by executing the TPP Agreements and sending it back to Defendant along with all outstanding necessary documentation to verify their eligibility.

370.    In the alternative, Defendant's sending of the TPP Agreements to Plaintiffs was an invitation to deal.  Plaintiffs' execution of the TPP Agreements and sending to Defendant any necessary documentation to verify their eligibility constituted an offer.  Defendant accepted the offer by accepting the Plaintiffs' TPP payments.

*Contract Formation: Consideration*

371.    The TPP Agreements are supported by consideration in the form of an exchange of mutual promises.  Plaintiffs promised to keep their information current and to make the trial payments on time.  In exchange, Defendant promised to consider Plaintiffs for, and if eligible, offer them a permanent modification agreement or to deny them such modification by written notice.

372.    In addition, or in the alternative, by agreeing to make reduced monthly payments during the trial period, Plaintiffs were agreeing to delay their obligations on paying back their loans and potentially increasing the total amount they would end up paying over the life of the loans.  Plaintiffs suffered detriment by agreeing to pay less than the full amount they owed.  Both sides benefited from the exchange in that Plaintiffs were presented with an opportunity to reduce their mortgage payments or save their home and OneWest enjoyed the ability to keep customers, receive

incentive payments from the government for performing the modifications, and avoid or mitigate the costs and risks associated with foreclosure.

373.     In the alternative, and explained in Count II and as incorporated fully herein, Plaintiffs' justifiable reliance serves as a substitute for any lack of consideration.

**Plaintiffs' Performance**

374.     Plaintiffs and other Class Members made their trial period payments and otherwise complied with the TPP Agreements by making and continuing to make their required payments, keeping all information and representations true and accurate in all material respects, and by taking all such other steps necessary under their respective TPP Agreements.

**Express Contract Terms**

375.     The TPP Agreements also provided that if Plaintiffs and other Class Members made their three trial payments on a timely basis, and otherwise complied with the terms of their TPP Agreements, then Defendant would consider them for, and if eligible, offer them a permanent loan modification, and waive any unpaid late charges accrued prior to the trial period.  Or, in the alternative, OneWest would reject homeowners who were not eligible and send written notice explaining why they did not qualify for the HAMP loan modification offer.

376.     The TPP contracts specifically described the "Modification Effective Date" (i.e., the date when OneWest would be required to inform Plaintiffs and other Class members whether or not they were eligible for a permanent HAMP loan modification) as "the first day of the month following the month in which the last Trial Period Payment is due."

**Defendant's Breach of Express Terms**

377.     Defendant intentionally and systematically delayed converting TPP Agreements into permanent modifications or denials by falsely claiming it lacked and repeatedly requesting

documents, information and payments already in its possession, failing to acknowledge timely receipt of trial payments, failing to implement adequate procedures and systems to respond to inquiries and complaints, and by otherwise dragging out and delaying its extension and consideration of offers for permanent loan modifications.

378.    Rather than responding to requests for permanent modifications from Plaintiffs and other Class Members, Defendant, improperly and without justification, ultimately decided to treat the TPP Agreements as if they were null and void and threatened foreclosure.

**_Implied Contract Terms_**

379.    Insofar as OneWest did not breach an express term of the TPP Agreements, OneWest breached an implied term that required it to consider Plaintiffs and other Class Members for and to extend the offers for permanent modification, or to reject ineligible homeowners, within a reasonable period of time following Plaintiffs' and the Class Members' performance under the TPP Agreements.

380.    The TPP Agreements, like all contracts entered into in Illinois and Oregon contained an implied duty of good faith and fair dealing. Insofar as the TPP Agreements placed discretion and broad authority in OneWest to determine HAMP eligibility and to administer the HAMP modification program, OneWest had a duty to perform consistent with its duty of good faith and fair dealing.

**_Defendant's Breach of Implied Terms_**

381.    Defendant routinely and regularly breached these implied duties of good faith and fair dealing by:

> a.    failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs and high professional standards of care;

b.     routinely demanding information and payments already in its possession and otherwise failing to implement an appropriate and functioning document management system;

c.     providing false justifications for refusing to extend offers for permanent modifications or to reject homeowners in a timely fashion;

d.     systematically making inaccurate calculations and determinations of Plaintiffs' and the Class Members' eligibility for HAMP;

e.     unreasonably delaying the extension or rejection of offers for permanent modifications to borrowers who perform fully and faithfully under their TPP Agreements;

f.     acting in a manner that otherwise constitutes an abuse of discretion or authority under the TPP Agreement or taking such other steps to frustrate Plaintiffs' ability to receive the benefit of their bargain under the TPP Agreements; and

g.     failing to acknowledge timely receipt of all trial payments and requested documentation.

### *Causation and Damages*

382.    As an actual and proximate result of Defendant's breaches of these express and implied contractual terms described herein, Plaintiffs and Class Members have suffered harm and are threatened with additional harm. Plaintiffs and Class Members have been damaged insofar as the delay or failure of OneWest to timely review and consider requests for permanent loan modifications has caused pecuniary harm.

383.    Plaintiffs and Class Members have further been damaged in the form of lost time and opportunity costs of pursuing other means of dealing with their default.  By making trial period payments both during and after the three month trial period, Plaintiffs and Class Members forewent other remedies that might have been pursued to save their homes, such as restructuring their debt under the federal bankruptcy laws with less of an arrearage, or pursuing other strategies to deal with their defaults, such as selling their homes with less of an arrearage as an impediment.  In addition, Defendant's breach caused Plaintiffs and Class Members damages in the form of fees, charges, accrued interest, increased principal, and other costs improperly applied to their accounts.

384.    Plaintiffs and Class Members were also harmed by Defendant's misreporting of delinquent trial payments to the credit bureaus.  As a result, the credit scores of Plaintiffs and putative members of the Class were severely impacted and credit cards were either cancelled or available credit was reduced.

385.    In certain situations, like that of the Copthornes and Little, some putative Class Members have suffered additional harm and expense in the form of defending foreclosures of their homes and losing their homes to improper foreclosures when, in reality, they should have been extended offers for permanent modifications of their mortgage loans.

### COUNT II

**Promissory Estoppel, In the Alternative to Count I**
**(on behalf of the Nationwide Class)**

386.    Plaintiffs repeat and re-allege the allegations above as if set forth herein in full.

387.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Nationwide Class described above.

388.    Defendant, by way of its TPP Agreements, unambiguously promised to Plaintiffs that if they executed and returned the TPP Agreements to Defendant along with supporting documentation, and made their TPP payments, they would be considered for an offer for permanent modification if eligible and would receive a response from Defendant.

389.    Defendant's promise was intended to induce each Plaintiff to rely on it and to make monthly TPP payments and otherwise perform.

390.    Plaintiffs indeed relied on Defendant's promise by submitting TPP payments and all necessary documentation and otherwise fully performing under the TPP Agreements.

391.    Given the language in the TPP Agreements, statements made by OneWest's customer service representatives, and the fact that the TTP agreements was backed by a federal governmental program, Plaintiffs' reliance was reasonable.

392.    Plaintiffs' reliance was to their detriment. By making TPP payments both during and after the TPP, Plaintiffs and Class Members forewent other remedies that might have been pursued to save their homes, such as restructuring their debt under the federal bankruptcy laws with less of an arrearage, or pursuing other strategies to deal with their defaults, such as selling their homes with less of an arrearage as an impediment.   In addition to the lost time and opportunity cost of pursuing other means of dealing with their default, Plaintiffs and Class Members suffered damages in the form of fees, charges, accrued interest, increase principal and other costs applied to their accounts.

393.    Plaintiffs and Class Members were also harmed by Defendant's misreporting of delinquent trial payments to the credit bureaus.   As a result, the credit scores of Plaintiffs and putative members of the Class were severely impacted and credit cards were either cancelled or available credit was reduced.

394.    In certain situations, like that of the Copthornes and Little, some putative Class Members have suffered additional harm and expense in the form of defending foreclosures of their homes and losing their homes to improper foreclosures when, in reality, they should have been extended offers for permanent modifications of their mortgage loans.

## COUNT III

### Violation of the Illinois and Oregon
### Consumer Protection Laws and Unfair and Deceptive Business Practices Acts
### (on behalf of the Illinois and Oregon Subclass Members)

395.    Plaintiffs repeat and re-allege the allegations above as if set forth herein in full.

396.    Plaintiffs Greggio and Barbosa bring these claims on their own behalf and on behalf of each member of an Illinois subclass.  OneWest's conduct as set forth herein violates the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.*.  The Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/2, *et seq*, provides in pertinent part that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.  In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15 U.S.C. § 45].

397.    Plaintiffs Harry and Judith Stratton bring these claims on their own behalf and on behalf of each member of an Oregon subclass.  OneWest's conduct as set forth herein violates the Oregon Unlawful Trade Practices Act, O.R.S. 646.605 *et seq*.  Under the Oregon Unlawful Trade Practices Act, "[a] person engages in an unlawful practice when in the course of the person's

business, vocation or occupation the person: (1) Employs any unconscionable tactic in connection with the sale, rental or other disposition of real estate, goods or services, or collection or enforcement of an obligation…" §6406.607(1).

398.    OneWest is engaged in the distribution of loan services.

399.    OneWest's conduct as set forth herein constitutes the offering, advertising and sale of goods, services and merchandise.

400.    OneWest's conduct as set forth herein occurred in the course of trade or commerce.

401.    OneWest's conduct as set forth herein affects the public interest and is part of a generalized course of conduct affecting numerous consumers.

402.    Plaintiffs and subclass members are consumers as they are persons who purchased or contracted for the purchase of loan services.

403.    Plaintiffs sought to obtain OneWest's goods and services primarily for personal, family or household use.

404.    OneWest made false, deceptive and misleading statements and omissions about material aspects of the goods and services described herein.  OneWest made these statements and omissions knowingly and willfully and with the intent that Plaintiffs and consumers would rely on them and would enter into contracts or obligations as a result.  Plaintiffs relied on OneWest's misstatements and omissions.

405.    OneWest's conduct as set forth herein is deceptive, unfair and unconscionable.

406.    OneWest's conduct as set forth herein is not permitted or authorized by Illinois, or Oregon law.

407. Defendant engaged in unfair and deceptive business acts and or practices by intentionally misrepresenting and concealing material facts concerning the loan modification process under HAMP, including:

    a. inducing Plaintiffs to default on their mortgage loans in order to become eligible for a loan modification under HAMP when Defendant knew or should have known that this was not required under HAMP;

    b. failing to respond to Plaintiffs after they make all their trial payments on time and supplied Defendant with the necessary documentation;

    c. inducing Plaintiffs to make TTP payments in lieu of the payment required under their loan documents and then imposing hefty late fees and other unauthorized fees (such as delinquency and inspect fees) during the TPP period; and

    d. threatening foreclosure proceedings during the TPP period when it promised to forego such proceedings during this period.

408. Defendant intended that Plaintiffs rely on its representations with respect to its promise to provide and consider them for permanent modifications. Defendant's omissions and representations were material. If Plaintiffs were not told that Defendant would not respond to their requests for or consider her for a loan modification, they would not have defaulted on their loans, submitted their documentation or made trial payments.

409. Defendant's conduct as described above constitutes "unfair" practices that not only caused substantial harm to Plaintiffs, but harmed the general public as well.

410. Defendant's immoral, unethical, oppressive and unscrupulous practices, which were implemented so as to delay the process as long as possible and to extract as much money as

possible from borrowers Defendant identified as being at risk for default prior to foreclosure, included but were not limited to:

    a.    Defendant knowingly designed and maintained a loan modification system that was purposely designed to hinder the loan modification process.

    b.    OneWest routinely lost loan documents, modification papers and other necessary materials to evaluate eligibility and routinely rejected Plaintiffs' TPP Agreements on false and incorrect grounds.

    c.    Defendant routinely required Plaintiffs to submit and re-submit documents and financial information already in its possession claiming that it would not review a borrower for eligibility until and unless these documents are submitted time and again.

    d.    While continuing to accept Plaintiffs' modified mortgage payments, Defendant sent them monthly letters threatening foreclosure or other severe consequences, while these borrowers in fact should have received offers for permanent modification.

    e.    Defendant routinely provided false information regarding its processes and standards, refused to put statements in writing when asked.

    f.    Defendant engaged in other conduct designed to extract money from "at risk" borrowers as opposed to actually helping such borrowers achieve modified loan terms.

411.    Defendant's acts or practices offend the clearly stated public policy of offering financial relief to homeowners who are in serious risk of foreclosure on their homes.

412.     Defendant's deceptive and/or unfair acts and practices described herein occurred in the course of conduct involving trade and commerce.

413.     Plaintiffs have suffered substantial injury and actual damages as an actual and proximate result of the Defendant's unfair and/or deceptive practices and acts.  By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debt under the federal bankruptcy laws with less of an arrearage, or pursuing other strategies to deal with their defaults, such as selling their homes with less of an arrearage as an impediment.   In addition to the lost time and opportunity cost of pursuing other means of dealing with their default, Defendant's unfair and/or deceptive practices and acts caused Plaintiffs damages in the form of fees, charges, accrued interest, increased principal and other costs applied to their accounts.

414.     In certain situations, like that of the Copthornes and Little, some putative class Members have suffered additional harm and expense in the form of defending foreclosures of their homes when, in reality, they should have been extended offers for permanent modifications of their mortgage loans.

415.     Plaintiffs were also harmed by Defendant's misreporting of delinquent trial payments to the credit bureaus.  As a result, the credit scores of Plaintiffs and putative members of the class were severely impacted and credit cards were either cancelled or available credit was reduced.

416.     As a result of OneWest's improper conduct, Plaintiffs and Subclass members suffered damages and ascertainable losses.

417.     Plaintiffs are entitled to actual and statutory damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

**COUNT IV:**

**Violations of the Equal Credit Opportunity Act**
**(on behalf of the Nationwide Class)**

418.    Plaintiffs repeat and re-allege the allegations in the paragraphs above as if set forth herein in full.

419.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Nationwide Class described above pursuant to the Equal Credit Opportunity Act, ("ECOA") at 15 U.S.C. § 1691e.

420.    HAMP specifically requires compliance with the ECOA.[3]

421.    Pursuant to Regulation B concerning ECOA notices, codified at 12 C.F.R. § 202.9, titled "Notifications" states in relevant part:

> (a)    Notification of action taken, ECOA notice, and statement of specific reasons –
>
> (1)    When notification is required.  A creditor shall notify an applicant of action taken within:
>> (i)    30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application;
>>
>> (ii)    30 days after taking adverse action on an incomplete application, unless notice is provided in accordance with paragraph (c) of this section;
>>
>> (iii)    30 days after taking adverse action on an existing account; or
>>
>> (iv) 90 days after notifying the applicant of a counteroffer if the applicant does not expressly accept or use the credit offered.

---

[3] *See* Home Affordable Modification Program Guidelines dated March 4, 2009 at p. 13 and HAMP Supplemental Directive 09-01 dated April 6, 2009 at p. 12.

422.    15 U.S.C. § 1691(d)(1) of the ECOA provides that "within thirty days…after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application."

423.    OneWest is a "creditor" as defined by ECOA at 15 U.S.C. § 1691a(e) because it regularly extends, renews, or continues credit and/or regularly arranges for the extension, renewal, or continuation of credit and in some cases is an assignee of an original creditor who participates in the decision to extend, renew, or continue credit.

424.    Plaintiffs and Class Members who made three payments as required by the TPP Agreements are "applicants" for a permanent HAMP loan modification as defined by ECOA at 15 U.S.C. § 1691a(b).

425.    Plaintiffs and Class Members submitted a "completed application" for a permanent HAMP loan modification pursuant to 12 C.F.R. § 202.9(a)(1)(i) no earlier than the date which they made the third payment required by the TPP Agreement.

426.    OneWest failed to provide notice of action taken on Plaintiffs and Class Members applications or provide specific reasons for denial within 30 days of its receipt of a completed application in violation of 15 U.S.C. § 1691(d) and 12 C.F.R. § 202.0(a).

427.    In the alternative, OneWest failed to act on Plaintiffs and Class Members incomplete applications or provide specific reasons for denial within 30 days of taking action on incomplete applications in violation of 15 U.S.C. § 1691(d) and 12 C.F.R. §202.9(a).

428.    Plaintiffs and Class Members were charged fees and reported as 30 days or more delinquent on their credit report as a direct result of OneWest failing to take action on the completed credit application for a loan modification.

429.    Plaintiffs and Class Members suffered damages as a result of being deprived of timely notice.

430.    Pursuant to 15 U.S.C § 1691e, Plaintiffs and Class Members are entitled to recover actual damage as set forth above, statutory punitive damages, costs and attorney fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests the following relief:

A.    Certify this case as a class action and appoint named Plaintiffs and other Class Members to be Class representatives and their counsel to be Class counsel;

B.    Award Plaintiffs and Class Members actual and compensatory damages for breach of contract and breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial;

C.    Award actual and compensatory damages and order other equitable relief as justice requires, including requiring Defendant to extend Plaintiffs and Class Members offers for permanent loan modifications or otherwise respond to homeowners on the theory of promissory estoppel;

E.    Enter an Order preliminarily and permanently enjoining OneWest's deceptive and unfair business practices as alleged herein, and award actual, compensatory and punitive damages for Defendant's violations of the Illinois Consumer Fraud Act and the Oregon Unlawful Trade Practices Act along with interest and attorneys' fees and costs;

F.    Order specific performance of Defendant's contractual obligations together with other relief required by contract, equity and law;

G.    Award actual and punitive damages to the Plaintiffs and the Class and Subclasses;

H.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

I.      Enter an Order preliminarily and permanently enjoining Defendant from initiating or proceeding with any foreclosure proceeding without first fairly and accurately determining whether the borrower named in the foreclosure proceeding is eligible for a HAMP or other modification; and

J.      Grant Plaintiffs and the Class and Subclasses such other and further relief as this Court fords necessary and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  March 15, 2013                             Respectfully Submitted,

                                                   EDELSON LLC

                                                   By:  /s/ Steven L. Woodrow
                                                   Jay Edelson
                                                   Steven L. Woodrow
                                                   Alicia E. Hwang
                                                   350 N. LaSalle Street, Suite 1300
                                                   Chicago, Illinois 60654
                                                   Tel:  312-589-6370
                                                   Fax:  312-589-6378

                                                   ABBEY SPANIER, LLP

                                                   By:  /s/ Richard B. Margolies
                                                   Karin E. Fisch
                                                   Richard B. Margolies
                                                   212 East 39th Street
                                                   New York, New York 10016
                                                   Tel.:  212-889-3700
                                                   Fax:  212-684-5191

                                                   *Attorneys for Plaintiffs*